T.C. Memo. 2015-236

UNITED STATES TAX COURT

JOHN A. ATKINSON AND JUDY B. ATKINSON, ET AL.,[1] Petitioners <u>v.</u>
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 2683-11,   2693-11,          Filed December 9, 2015.
           2694-11,   2695-11,
           2700-11, 18938-12.

<u>David M. Wooldridge</u>, <u>Ronald A. Levitt</u>, <u>Gregory P. Rhodes</u>, and <u>Michelle Abroms Levin</u>, for petitioners.

<u>Christopher D. Bradley</u> and <u>John T. Arthur</u>, for respondent.

---

[1]Cases of the following petitioners are consolidated herewith:  Kenan C. Wright and Molly F. Wright, docket No. 2693-11;  Warren W. Wills Jr., and Margaret A. Wright, docket No. 2694-11; H. Edward Wright III and Phyllis C. Wright, docket No. 2695-11; Dwight C. Hopkins and Martha W. Hopkins, docket No. 2700-11; and The Reserve Club at St. James Plantation, LLC, Reserve Development Co., Tax Matters Partner, docket No. 18938-12.

[*2] MEMORANDUM FINDINGS OF FACT AND OPINION

WELLS, <u>Judge</u>:  Petitioners contest the following deficiencies and penalties:

| Petitioner | Period | Deficiency | Penalty |
|---|---|---|---|
| The Reserve Club | 2005 | $2,861,362 | $551,886 or 1,103,772 |
| John & Judy B. Atkinson | 2003 | 138,847 | 27,769 |
| John & Judy B. Atkinson | 2005 | 85,783 | 17,157 |
| H. Edward & Phyllis C. Wright | 2003 | 180,887 | 36,177 |
| H. Edward & Phyllis C. Wright | 2004 | 161,403 | 32,281 |
| H. Edward & Phyllis C. Wright | 2005 | 31,000 | -- |
| Warren W. Wills, Jr., & M. Wright | 2003 | 234,431 | 46,886 |
| Warren W. Wills, Jr., & M. Wright | 2004 | 131,179 | 26,236 |
| Dwight C. & Martha W. Hopkins | 2003 | 183,374 | 36,675 |
| Dwight C. & Martha W. Hopkins | 2004 | 156,863 | 31,373 |
| Dwight C. & Martha W. Hopkins | 2005 | 33,053 | -- |
| Kenan C. & Molly F. Wright | 2003 | 192,244 | 38,449 |
| Kenan C. & Molly F. Wright | 2004 | 177,036 | 35,407 |
| Kenan C. & Molly F. Wright | 2005 | 4,010 | -- |

The issues in the instant cases concern petitioners' entitlement to charitable contribution deductions and expense deductions for the following two conservation easements on an operating golf course in North Carolina:  (1) a deduction of $5,223,000 plus expenses for tax year 2003 for a conservation easement conveyed by The Members Club at St. James Plantation, LLC (Members

**[*3]** Club) and (2) a deduction of $2,657,500 plus expenses for tax year 2005 for a conservation easement conveyed by The Reserve Club at St. James Plantation, LLC (Reserve Club). The issues we must decide are whether the conservation easements comply with the "conservation purpose" requirement of section 170(h);[2] whether the easements were properly valued for purposes of the deduction under section 170(a); and, if petitioners are not entitled to deductions under section 170(a), whether they are liable for accuracy-related penalties.

We note here that we were presented with similar issues in Kiva Dunes Conservation, LLC v. Commissioner, T.C. Memo. 2009-145. As in the instant cases, the taxpayer in Kiva Dunes conveyed a conservation easement over an operating golf course and claimed a deduction under section 170. However, in Kiva Dunes we were not required to decide the issue of compliance with the conservation purpose requirement of section 170(h) because the Commissioner had conceded that issue on brief, after trial, and we therefore decided only the remaining valuation issue. In the instant cases, we address the conservation purpose issue; but because of our holding below, we do not reach the valuation issues.

---

[2]Unless otherwise indicated, section references are to the Internal Revenue Code of 1986, as amended and as in effect for the years in issue, and Rule references are to the Tax Court Rule of Practice and Procedure.

**[*4]**                                FINDINGS OF FACT

Some of the facts and certain exhibits have been stipulated by the parties. The facts so stipulated are incorporated in this opinion and are found accordingly. Petitioner Reserve Development Co., a limited liability company that had an office in Southport, North Carolina, at the time its petition was filed, is the tax matters partner for the Reserve Club. The individual petitioners are the 2003 members[3] of the Members Club and their spouses (Members Club petitioners). Petitioners Warren W. Wills, Jr., and Margaret A. Wright resided in Georgia at the time they filed the petition in their case, docket No. 2694-11. All remaining individual petitioners resided in North Carolina at the time their petitions were filed, including John A. and Judy B. Atkinson, docket No. 2683-11; Dwight C. and Martha W. Hopkins, docket No. 2700-11; Kenan C. and Molly F. Wright, docket No. 2693-11; and H. Edward Wright III and Phyllis C. Wright, docket No. 2695-11.[4]

---

[3]Although they are taxed as partners for Federal tax purposes, we refer to the individual petitioners as "members" and not "partners" because the Members Club is not a partnership but rather a limited liability company formed under North Carolina law.

[4]We sometimes herein use the term "petitioners" to refer to the Members Club petitioners as well as the combination of the Members Club petitioners and the Reserve Club tax matters partner.

**[*5]** I.    Background

The contributed easement areas relating to the disputed charitable contribution deductions are within St. James Plantation, a community development established in 1991 covering 91% of the Town of St. James, west of Southport, North Carolina (St. James Plantation).  Several entities, such as the Members Club and the Reserve Club, own portions of St. James Plantation.  Over a period of several years St. James Plantation worked closely with the North American Land Trust (NALT) to create a system of easements over the development with the goal of protecting important habitat and a significant geologic area.  St. James Plantation is a development comprising residential areas, recreational facilities such as golf courses, and undeveloped land.  St. James Plantation has gated entrances with a staffed guardhouse on each of the three roads into and out of the development. Drivers are obliged to stop at a gated entrance and state the purpose of their visit to obtain entry.  All of the residences, businesses, and amenities in St. James Plantation, including all property covered by the easements in issue in the instant cases, can be accessed only via road by passing through a gated entrance.

**[*6]** II.     2003 Easement

    A.     Introduction

In 2001 St. James Plantation added nine holes known as the "Cate 9" to the Members Club Golf Course.  On December 30, 2003, the Members Club conveyed a conservation easement to NALT over 79.193 acres covering the area in and around the Cate 9, which was operating as a golf course at the time (2003 easement).  The 2003 easement property consists of six noncontiguous tracts, ranging in size from 4.9 acres to 23.4 acres, which come together in a vaguely figure-eight shape.  The 2003 easement property is bordered by residential lots except for the center of the figure-eight, where the property directly abuts swamps and wetlands.  The 2003 easement property consists of fairways, greens, teeing grounds, ranges, rough, ponds, and wetland areas in the following proportions:

| Area | Acres | Percentage |
|---|---|---|
| Tees, bunkers, fairways, greens | 15.055 | 19 |
| Rough | 26.952 | 34 |
| Ponds | 12.504 | 15.8 |
| Other | 20.72 | 26.2 |
| Wetlands | 3.962 | 5 |
| Total | 79.193 | 100 |

**[\*7]** The foregoing percentages do not include the portion of the 2003 easement property which is covered by a concrete cart path winding through all six tracts of the 2003 easement, including areas labeled "wetlands" and "other".

Eight months after securing the 2003 easement, NALT obtained the Middle Swamp easement, a conservation easement over approximately 32.3 acres of swamps and wetlands abutting the center of the figure-eight-shaped 2003 easement.[5]  NALT considers the Middle Swamp a "wetland conservation area". Photos of the Middle Swamp show tall trees, undisturbed yet open understory, and a walkway.  A 2011 U.S. Fish and Wildlife Service map of the area shows wetlands classified in the Middle Swamp area.  The 2003 easement had been granted in contemplation of the Middle Swamp easement.

B.     Terms of the 2003 Easement

The 2003 easement deed identifies two conservation purposes:

> Preservation of the Conservation Area as a relatively natural habitat of fish, wildlife, or plants or similar ecosystem; and Preservation of the Conservation Area as open space which, if preserved, will advance a clearly delineated Federal, State or local governmental conservation policy and will yield a significant public benefit.

---

[5]We discuss the contributory benefits the 2003 easement may provide to the Middle Swamp without regard to the fact that there was no guaranty that the Middle Swamp easement would be issued at the time the 2003 easement was granted.

**[*8]**   Pursuant to the terms of the 2003 easement, the owners of the easement area retain the right to operate a golf course, make alterations, and engage in certain construction activities.  The golf course in the 2003 easement area may be altered "in such manner as Owner determines to be appropriate" as long as "the best environmental practices then prevailing in the golf industry" are used and applied.

Specifically, the 2003 easement allows for digging (filling, excavating, dredging, or removing topsoil) as necessary for maintaining golf course sand traps or for the cultivation of sod for use on the golf course.  Cart paths may be relocated as long as the relocation does not substantially increase the surface area taken up by cart paths.  The deed permits the construction of rain shelters, rest stations, food concession stands, and other structures on the easement property as long as they do not exceed a total of 2,500 square feet.  The owner may substantially increase the amount of surface area covered by the golf course if it secures prior consent from the easement holder and there is no material adverse effect on the conservation purposes.

The owner may also cut and remove trees that are on the golf course or within 30 feet of the golf course if the owner determines their removal is "appropriate for the proper maintenance of the golf course".  Additionally, the

[*9] owner may cut trees to build a restroom, rain shelter, rest station, or food concession stand.

To maintain the Cate 9, St. James Plantation applies fungicides, herbicides, insecticides, and adjuvants on the tees, fairways, and rough. The 2003 easement deed does not prohibit the use of pesticides and other chemicals on the 2003 easement property. While the 2003 easement deed prohibits the manufacture of chemicals of any kind, it allows for the storage and use of chemicals in connection with activities not prohibited by the easement deed. The 2003 easement deed provides the owner with "the right to operate and manage" a golf course on the property and to maintain "turf grass and other vegetation * * * of the Golf Course in such manner as Owner determines to be appropriate". Moreover, NALT's annual monitoring reports state that the easement areas, including the 2003 easement area, appeared to be in very good condition and in accord with the terms of the various easement documents. Accordingly, the application of these chemicals is within the terms of the easement deed.

C.    Natural Qualities

The 2003 easement is in Brunswick County, which lies within the Cape Fear Arch. The region has been identified as a biodiversity hotspot by the Nature Conservancy, a natural heritage program. According to the Cape Fear Arch

[*10] Conservation Collaborative 2009 Conservation Plan, the Cape Fear Arch has the highest biological diversity of any area on the Atlantic Coast north of Florida. It is close to, but not in, the Boiling Springs Lakes Complex.

On February 24, 2004, Christopher R. Wilson, a conservation biologist with NALT, inspected the 2003 easement area and produced a baseline report. The report generally describes the importance of preserving areas and forests described as "old-growth" which include "woody debris" and "undisturbed soils". The report also recognizes the ecological importance of "active forest management activities", such as prescribed burns, and encourages landowners to recognize the "extreme ecological importance of woody debris and undisturbed soils".

Mr. Wilson observed several species on the 2003 easement property such as Fish Crows, Great Blue Herons, and American Kestrel. The golf superintendent who accompanied Mr. Wilson during the inspection advised him that an "American Alligator (a State Threatened Species) * * * [was] occasionally observed on the course's ponds". "Threatened" is defined as "a taxon likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range". The report states the property provides wildlife travel corridors for the Red-Cockaded Woodpecker, a species federally designated as "endangered", which is defined as "a taxon in danger of extinction through all

**[*11]** or part of its range".  The report, however, does not reference any specific sightings or evidence of migration of the Red-Cockaded Woodpecker on the 2003 easement property.

The report also includes photos which mostly depict open areas of mowed grass, ponds surrounded by mowed grass, and a line of trees with dense foliage surrounding houses.  One photo shows a pond surrounded by many bushes and trees; no houses are visible in that photo.  The pond with the densest foliage surrounding it, where Mr. Wilson heard a Large Southern Leopard Frog Chorus, is labeled a "Temporary pool habitat".

At trial NALT representatives testified that they had seen plants of particular concern such as Venus Flytraps on the 2003 easement area and located them with GPS coordinates.  The baseline report includes an NC Natural Heritage Program map identifying where Venus Flytrap plants are located, but none of the locations are on the 2003 easement area.  The Venus Flytrap is designated a "Federal Species of Concern", meaning it is more stable than "endangered", the highest designation, or "threatened", the second highest designation.  In global ranks, the Venus Flytrap is a G3, meaning it is "[r]are or uncommon (localized within range or narrowly endemic to special habitats, generally 20-100

[*12] occurrences)" and falls between G2, "[i]mperiled globally because of rarity", and G4, "[a]pparently secure".

NALT also issued monitoring reports after inspections conducted in 2006, 2008, 2010, 2011, 2012, and 2013. The reports consist mostly of photos. The photos of the Cate 9 area show: a stone weir at the bottom of a small pond surrounded by houses and a few bushes and trees; Plume Grass in a small landscaped area adjacent to the golf fairway with trees and houses in the background; an emergency bridge constructed after the easement was granted; and many images of the fairways which variably include a cart path, a line of trees dotted with houses, and ponds surrounded mostly by well-manicured grass.

The text of the monitoring reports describes six easement properties in St. James Plantation. Although the reports note sightings of animals, they do not always specify on which of the easement properties they were seen. As mentioned above, the reports all state that St. James Plantation complied with the terms of the easement deeds. NALT did not collect or analyze soil or water samples for any of its reports.

D. Notice of Deficiency

On or about April 15, 2004, the Members Club filed its Form 1065, U.S. Return of Partnership Income, for the tax year ended 2003. On its 2003 Form

[*13] 1065, the Members Club deducted a charitable contribution of $5,223,000 as the claimed value of the 2003 easement and attached an appraisal by F. Bruce Sauter. Attached to the Members Club's 2003 Form 1065 are Schedules K-1, Partner's Share of Current Income, Deductions, Credits, and Other Items, showing the amount allocated to each of the Members Club petitioners. Those petitioners then reported the amounts on their individual Forms 1040, U.S. Individual Income Tax Return. On November 2, 2010, respondent issued a notice of deficiency to each of the individual petitioners disallowing their portion of the charitable contribution deduction. On February 1, 2011, each of the Members Club petitioners timely filed a petition with the Tax Court for redetermination of the deficiencies determined in the notices of deficiency. On October 14, 2011, the Court granted respondent's motion to consolidate for trial, briefing, and opinion.

III. 2005 Easement

    A. Introduction

On December 23, 2005, the Reserve Club conveyed a conservation easement on 90.74 acres within St. James Plantation to NALT (2005 easement). The 2005 easement encumbers most of the Reserve Club Golf Course, which opened for play in July 2006. The 2005 easement area consists of 3 noncontiguous tracts, each approximately 30 acres. The 2005 easement area is

[*14] bordered in part by residential lots. As with the 2003 easement, the 2005 easement property's noncontiguous tracts cover a variety of land types:

| Area | Acres | Percentage |
|---|---|---|
| Tees, bunkers, fairways, greens | 15.513 | 17.1 |
| Rough | 13.178 | 14.5 |
| Ponds | 9.550 | 10.5 |
| Other | 18.573 | 20.5 |
| Wetlands | 33.930 | 37.4 |
| Total | 90.74 | 100 |

The 2005 easement area also includes a winding, concrete cart path, the area of which is not included in the property percentages. Concurrently with the 2005 easement, NALT was granted a second easement over approximately 256.39 acres by the Reserve Development Co., LLC (Wetlands II easement). The Wetlands II easement area borders the eastern edge of tract 1 of the 2005 easement area.

B.     Terms of the 2005 Easement

The 2005 easement deed is almost identical to the 2003 easement deed. The deed states the same two conservation purposes and provides for the same reserved rights. The reserved rights include, among others: the right to operate and manage a golf course; the right to alter or modify the golf course and cart path provided their aggregate surface area does not substantially increase without the

[*15] prior consent of the easement holder; the right to construct and maintain utility facilities within certain limitations; the right to construct and maintain stands or blinds for hunting or wildlife observation; and the right to cut, remove, or destroy trees within 30 feet of the golf course. Some of such reserved rights do not apply to areas designated as wetlands. St. James Plantation applies fungicides, herbicides, insecticides, and adjuvants on the tees, fairways, and rough, which the easement deed does not prohibit.

### C. Natural Qualities

As with the 2003 easement, the 2005 easement is in Brunswick County and the Cape Fear Arch. Additionally, portions of the 2005 easement are within the Boiling Springs Lake Wetland Complex, a section of the Cape Fear Arch delineated as nationally significant by the North Carolina Natural Heritage Program and the Nature Conservancy. The 2005 easement is in an area that was once dominated by longleaf pine forests.

Peter Smith, a conservation biologist for NALT, inspected the 2005 easement area on November 22, 2005, and September 18, 2006, before producing a baseline report. The baseline report covers the 2005 easement and the Wetlands II easement areas together. As with the 2003 easement baseline report, the 2005 easement baseline report describes the desired condition for the easement property

[*16] forests as "old-growth", containing well-developed soils and an abundance of woody debris.  The report also addresses "Aquatic Features Management" and discusses streams, stream channels, wetlands, and bogs.  The report mentions ponds in that it says that the introduction of fish to the ponds is discouraged.

The report also identifies species seen on the 2005 easement area.  Two of the species are recognized on the Federal level as discussed above:  the Venus Flytrap, which is a species of concern, and the American Alligator, which is threatened.  Three species, the Shortleaf Yellow-Eyed Grass, Yellow Pitcher Plant, and Purple Pitcher Plant, are recognized at the State level as either "significantly rare - peripheral" or "exploited plants".  The report also identifies species to be potentially found in the 2005 easement, including the Red-Cockaded Woodpecker.  The report notes that the primary adjacent land use is "residential/golf course community development".

The photos in the report show images of both the 2005 easement area and the Wetlands II area.  The photos specifically marked as being from the Reserve Club Golf Course, most of which is covered by the 2005 easement, show:  a pond surrounded by mowed grass up to the edge and trees in the distance; undeveloped wetlands; a concrete bridge over mostly undeveloped wetlands with sparse trees in the distance; a picture of the golf course, shown ringed by a line of trees; and a

[*17] mowed open field transected by rougher shrubs and grasses and ringed by a concrete path and trees. Most of the tree coverage appears fairly dense from the ground to the tree tops.

NALT included the 2005 easement in the same monitoring reports as the 2003 easement. Only one monitoring report, issued in 2006, notes that NALT observed good populations of wetland plants, including the Venus Flytrap and Pitcher Plants, captured in two closeup photos. The Eastern Fox Squirrel, designated "significantly rare" by North Carolina, was also observed in the 2005 easement area. In describing the habitat factors, Mr. Smith wrote that there were no noted "denning sites", i.e., sites where animals build their dens. The photos in these reports echo the photos of the baseline report, depicting manicured grass, ponds, trees, cart paths, and some wetlands. One photo shows tall trees with an open understory.

D.     Final Partnership Administrative Adjustment

On April 15, 2006, the Reserve Club filed its Form 1065 for tax year 2005. The Reserve Club deducted a charitable contribution of $2,657,500 as the claimed value of the 2005 conservation easement and attached an appraisal by Mr. Sauter. On May 14, 2012, respondent issued to the tax matters partner of the Reserve Club a notice of final partnership administrative adjustment (FPAA) proposing to

**[*18]** disallow the deduction for the conservation easement. On July 25, 2012, the Reserve Club tax matters partner timely filed a petition with the Tax Court for readjustment of the adjustments in the FPAA. On November 15, 2012, this Court ordered the Reserve Club's case to be consolidated with the Members Club cases.

OPINION

I.    Jurisdiction

Because one of the petitions was filed in respect of an LLC treated as a partnership subject to TEFRA, we begin our analysis with a discussion of the Court's jurisdiction over a TEFRA proceeding. The Court is a court of limited jurisdiction, and we may exercise our jurisdiction only to the extent provided by Congress. See sec. 7442. The Court has authority in a TEFRA partnership-level proceeding to determine all partnership items for a partnership taxable year to which the FPAA relates, the proper allocation of partnership items among the partnership's partners, and the application of any penalty, addition to tax, or additional amount that relates to an adjustment to a partnership item. Sec. 6226(f). Partnership items include, among other items, nondeductible partnership expenses such as charitable contributions. Sec. 301.6231(a)(3)-1(a)(1)(ii), Proced. & Admin. Regs. The Court's jurisdiction over a TEFRA partnership-level

[*19] proceeding is invoked upon the Commissioner's issuance of a valid FPAA and the proper filing of a petition for readjustment of partnership items for the year or years to which the FPAA pertains.  See Harbor Cove Marina Partners P'ship v. Commissioner, 123 T.C. 64, 78 (2004).  Petitioner Reserve Development Co. timely filed a petition challenging the adjustments in the FPAA.  We therefore have jurisdiction to determine whether the charitable contribution deduction in issue was properly taken by the Reserve Club pursuant to section 170, as well as the applicability of any related penalty or addition to tax.  Sec. 6226(f).

II.    Legal Standard

Taxpayers may deduct the value of charitable contributions made during the tax year pursuant to section 170(a)(1).  Generally, taxpayers are not entitled to deduct gifts of property that consist of less than the taxpayers' entire interest in that property.  Sec. 170(f)(3).  However, taxpayers are permitted to deduct the value of a contribution of a partial interest in property that constitutes a "qualified conservation contribution" as defined in section 170(h)(1).  Sec. 170(f)(3)(B)(iii).

For a contribution to constitute a qualified conservation contribution, the contribution must be (1) of a "qualified real property interest", (2) to a "qualified organization", and (3) "exclusively for conservation purposes."  Sec. 170(h)(1).  In the instant cases, the parties agree that the contributions petitioners made were of

**[*20]** qualified real property interests and that those contributions were made to a qualified organization. Accordingly, the only issues remaining for us to decide are whether those contributions were made exclusively for conservation purposes and, if so, whether petitioners properly valued their contributions.

A contribution must satisfy one of the purposes set forth in section 170(h)(4) in order to be made exclusively for conservation purposes. Petitioners contend that the contributions satisfied the requirements of the second and third conservation purposes set forth in section 170(h)(4)(A), to wit:

> (ii) the protection of a relatively natural habitat of fish, wildlife, or plants, or similar ecosystem,

> \*      \*      \*      \*      \*      \*      \*

> (iii) the preservation of open space (including farmland and forest land) where such preservation is--

>> (I) for the scenic enjoyment of the general public, or

>> (II) pursuant to a clearly delineated Federal, State, or local governmental conservation policy, and will yield a significant public benefit * * *

In the instant cases, respondent and petitioners presented expert testimony to establish their respective positions as to whether the easement areas serve the purpose of protecting relatively natural habitat pursuant to section 170(h)(4)(A)(ii)

**[*21]** ("protecting natural habitat" purpose). Respondent offered the expert reports of Curtis Richardson, who holds degrees in biology, botany, and ecology and has been a professor at Duke University for 36 years. Dr. Richardson oversaw research in the Everglades and was hired by the U.S. State Department to be the chief ecologist to evaluate marshes in Iraq. Dr. Richardson's reports are based on a review of the background materials provided by the parties, an assessment of relevant literature, criteria for conservation easements, a field survey on November 22, 2013, and lab analysis of collected samples.

Petitioners offered the expert reports of James Luken, who holds degrees in zoology, biology, and botany and has been a professor of biology at Coastal Carolina University since 2001. Dr. Luken has published several papers on Venus Flytraps and the habitats associated with the Carolina Bays and is a coordinator of the Coastal Marine and Wetlands Studies Graduate Program. The reports of the parties' experts were admitted as the expert testimony of their preparers.

Neither party presented expert testimony to establish whether the easement areas serve the purpose of preserving open space pursuant to section 170(h)(4)(A), either for scenic enjoyment or pursuant to a clearly delineated government conservation policy ("preservation of open space" purpose).

**[\*22]** III.    Burden of Proof

As a preliminary matter, we consider petitioners' contention that the burden of proof has shifted to respondent pursuant to section 7491(a).  Generally, the Commissioner's determination of a deficiency is presumed correct, and the taxpayer has the burden of proving it incorrect.  Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933).  Section 7491(a)(1) provides an exception that places the burden of proof on the Commissioner as to any factual issue relevant to a taxpayer's liability for tax.  The burden of proof shifts with respect to a factual issue pursuant to section 7491 if the taxpayer introduces credible evidence with respect to that issue and the taxpayer satisfies certain other conditions, such as substantiation and cooperation with the Commissioner's reasonable requests for witnesses, documents, other information, and meetings.  Sec. 7491(a)(2); see also Rule 142(a)(2).  The taxpayer bears the burden of proving that the requirements of section 7491(a) have been met.  Rolfs v. Commissioner, 135 T.C. 471, 483 (2010), aff'd, 668 F.3d 888 (7th Cir. 2012).

Respondent contends that petitioners have not introduced credible evidence with respect to any of the factual issues.  For purposes of section 7491(a)(1), "credible evidence" means "evidence that, 'after critical analysis, the Court would find sufficient upon which to base a decision on the issue if no contrary evidence

**[*23]** were submitted'". <u>Geiger v. Commissioner</u>, T.C. Memo. 2006-271, 2006 WL 3781098, at *4 (quoting <u>Higbee v. Commissioner</u>, 116 T.C. 438, 442 2001)), <u>aff'd</u>, 279 F. App'x 834 (11th Cir. 2008).

We conclude that petitioners produced credible evidence as required by section 7491(a) with respect to whether their easements satisfied the "protecting natural habitat" purpose under section 170(h)(4)(A)(ii). Petitioners provided the testimony of Mr. Branbell, a longtime employee of St. James Plantation, to testify as to the conservation goals of St. James Plantation as a whole; Mr. Smith and Andrew Johnson, both of NALT, to testify that the 2003 and 2005 easements furthered the conservation goals of NALT; and Dr. Luken, to provide expert testimony over the condition and conservation purposes of the 2003 and 2005 easement areas. On the basis of that testimony, we are satisfied that petitioners have produced credible evidence as to that purpose under section 170(h)(4)(A)(ii).

Petitioners also satisfy the other conditions of section 7491(a). Petitioners substantiated the items in issue and maintained the necessary records, and respondent conceded in his opening brief that petitioners fully cooperated during respondent's examination of their returns. Accordingly, the requirements of section 7491(a)(2)(B) have been met regarding the issue of the "protecting natural habitat" purpose. We therefore hold that the burden of proof shifts to respondent

[*24] pursuant to section 7491(a)(1) on the issue of whether the easements satisfy the "protecting natural habitat" purpose requirements of section 170(h)(4)(A)(ii).

In contrast, with respect to whether the easements satisfy the "preservation of open space" purpose under section 170(h)(4)(A)(iii), we conclude that petitioners did not produce credible evidence as required by section 7491(a). Petitioners provided no witnesses, expert or otherwise, to testify as to any government conservation policy furthered by the easements or any scenic enjoyment provided to the public. We therefore hold that the burden of proof remains with petitioners with respect to the "preservation of open space" purpose issue under section 170(h)(4)(A)(iii).

IV.    Relatively Natural Habitat

To satisfy the "protecting natural habitat" purpose requirements pursuant to section 170(h)(4)(A)(ii), the regulations require that the donation "protect a significant relatively natural habitat in which a fish, wildlife, or plant community, or similar ecosystem, normally lives". Sec. 1.170A-14(d)(3)(i), Income Tax Regs. A "habitat" is an "area or environment where an organism or ecological community normally lives or occurs" or the "place where a person or thing is most likely to be found." Glass v. Commissioner, 124 T.C. 258, 281-282 (2005) (quoting the American Heritage Dictionary of the English Language 786 (4th ed.

**[*25]** 2000)), aff'd, 471 F.3d 698 (6th Cir. 2006). Additionally, the habitat must be "significant". The regulations offer the following guidance with respect to what constitutes a "significant habitat or ecosystem":

> Significant habitats and ecosystems include, but are not limited to, habitats for rare, endangered, or threatened species of animal, fish, or plants; * * * and natural areas which are included in, or which contribute to, the ecological viability of a local, state, or national park, nature preserve, wildlife refuge, wilderness area, or other similar conservation area.

Sec. 1.170A-14(d)(3)(ii), Income Tax Regs. The regulations allow for alteration of the habitat or environment "to some extent"; human activity will not result in the denial of a deduction "if the fish, wildlife, or plants continue to exist there in a relatively natural state". Id. subdiv. (i).

Petitioners contend that the 2003 easement and the 2005 easement satisfy the conservation requirements of the "protecting natural habitat" purpose. Petitioners contend that each easement has independent conservation significance but that it is also necessary to assess each respective easement's role as contributing to the ecological viability of the surrounding area. Respondent, focusing on the operation of the golf courses, contends that the rights petitioners retained under the conservation deeds negate any purported conservation purpose of the easements. We address in turn each easement's independent conservation

[*26] significance, its contributory role, and the effect of the retained rights, keeping in mind that respondent must satisfy his burden of proof regarding the issue.

A. 2003 Easement

1. Independent Conservation Significance

Petitioners contend that the 2003 easement protects forests, ponds, and wetlands which provide a variety of habitats for plants and animals of environmental concern. Petitioners contend that the location of the 2003 easement property within the Cape Fear Arch supports a finding that the 2003 easement property is a significant natural habitat.

Petitioners' expert Dr. Luken stated in his report that the most significant of these ecological features is the forest of longleaf pine at the margins of the fairways. Such trees are described as remarkable because many have been otherwise eliminated through logging, damage, or the absence of fire. The evidence shows, however, that the terms of the 2003 easement do not protect the longleaf pine from removal and that the longleaf pine currently on the 2003 easement property is not maintained in a relatively natural state.

The 2003 easement does not protect longleaf pine because the terms of the easement allow for the removal of a large number of trees currently on the 2003

[*27] easement property. It is unclear how much of the 2003 easement property is covered in longleaf pine, but Dr. Luken describes the "longleaf remnants" as being "protected by housing development on one side and fairways on the other". The houses to which Dr. Luken refers border the 2003 easement area. Consequently, the trees exist in a margin around the fairways of the Cate 9 Golf Course. Most of the photographs submitted into evidence, including one of the photographs in Dr. Luken's expert report, confirm the trees' proximity to the houses and lots that border almost the entirety of the easement area.

Under the terms of the 2003 easement deed, any trees within 30 feet of the fairways are eligible for cutting and removing. Because the trees exist in a thin line around the margin of the fairway, a significant number of them fall within this 30-foot area. The photographs submitted into evidence show that some of the trees are so near the bordering houses that they do not even appear to be on the 2003 easement property. Additionally, the terms of the 2003 easement deed allow trees to be removed for the building of a restroom, rain shelter, rest station, or food concession stand. Indeed, the monitoring reports show that an "emergency bridge" has already been constructed on the 2003 easement area. If the 2003 easement property were altered within the terms fully permitted in the 2003 easement deed, the conservation purpose would be significantly undermined. Our

[*28] conclusion is buttressed by Dr. Luken's own testimony that the longleaf pine must be protected from development in general and that the habitat of the longleaf pine does not spill into the fairways.

The longleaf pine on the 2003 easement property does not currently exist in a relatively natural state worthy of conservation. Mature longleaf pine forests once included trees that grew to 100 feet tall and 3 feet in diameter. Longleaf pine trees of that size are now rare, and there are none on St. James Plantation, suggesting that none of those trees represent the "old growth" NALT highlighted as being important.

There is no management plan, such as prescribed burning, to ensure that the longleaf pine will reach and maintain a relatively natural state. NALT highlighted the importance of active forest management such as prescribed burning. Longleaf pine grows in sandy soil which is generally nutrient poor. Fire is therefore important to a longleaf pine community because it releases nutrients and clears the understory. Dr. Luken testified that the longleaf pine has suffered in part because of the absence of fire. Yet there is no prescribed burning or mention of any plan for such burning on the 2003 easement property.

Nor does St. James Plantation have a management plan to ensure that the cutting of shrubs and bushes mimics prescribed burning. Dr. Luken testified that

[*29] he "suspects" St. James Plantation cuts shrubs growing under longleaf pine to mimic how fire clears understory in longleaf pine forests. St. James Plantation does not, however, have a management strategy or program for the longleaf pine areas. Indeed, many of the photographs of the 2003 easement area in evidence show trees with dense foliage at their base, a fact to which Dr. Luken alluded in his testimony when he stated that, in the pictures, "if you look at some of the pictures in there, you'll see some of the pine forests that haven't been cut back, you'll see how quickly the shrubs grow back". Finally, even if there were such a management plan, the evidence shows that simply cutting bushes does not provide the important release of nutrients that would occur in a prescribed fire.

Petitioners contend that the 2003 easement property contains ponds which replicate the natural habitat found in the shallow ponds of Boiling Springs Lakes and Big Cypress Bay. Respondent's expert Dr. Richardson presented evidence that the 2003 easement property did not contain any ponds before the development of the Cate 9 Golf Course. Accordingly, respondent contends that the ponds cannot provide a significant relatively natural habitat, because ponds are not part of the area's natural habitat. However, the regulations allow for alteration of the habitat or the environment so long as fish, wildlife, or plants exist in a relatively natural state. Sec. 1.170A-14(d)(3)(i), Income Tax Regs. The example found in

[*30] the regulations is a "lake formed by a man-made dam or salt pond" that would meet the conservation purpose test "if the lake or pond were a natural feeding area for a wildlife community that included rare, endangered, or threatened native species." Id. Consequently, we further analyze whether the ponds on the 2003 easement allow rare, endangered, or threatened native species of wildlife or plants to exist in a relatively natural state.

Petitioners contend that the unmanicured edges of the 2003 easement ponds create a diverse community of plants and offer transition zones that provide a relatively natural habitat for amphibians, reptiles and birds. Petitioners contend that the edges of the ponds in the 2003 easement property are particularly beneficial because they support rare plants and wildlife feeding areas. However, the evidence leads us to the opposite conclusion. Very few ponds have a natural edge. During his survey of the easement area, Dr. Richardson observed that many ponds had no edge whatsoever. Dr. Luken's report also shows ponds that have no edge or only a partial edge, and he testified that, in a more natural setting, the transition zone would be greater. The best example contained in NALT's reports of a pond providing natural habitat was a pond where NALT's representative heard a "large Southern Leopard Frog chorus", but even that pond was identified as "temporary".

**[*31]** Dr. Luken also testified that "[w]hen the edges are not regularly mowed or sprayed, a diverse community of plants emerges * * * [which] in turn provides habitat for amphibians, reptiles, and birds". However, the evidence shows that St. James Plantation uses pesticides on the Cate 9 Golf Course. The 2003 easement ponds are found on or adjacent to the Cate 9 Golf Course fairways; therefore, many of the pond edges are regularly sprayed. While a conservation area need only be "relatively natural" to satisfy the statute and the regulations, it must sufficiently mimic nature so that plants and animals would be able to use it. Consequently, when a pond in this ecosystem has no edge, it does not provide even a "relatively" natural habitat for amphibians, reptiles and birds.

Dr. Richardson's analysis of the pond water samples showed reduced oxygen, increased salinity, and levels of nitrogen beyond EPA recommendations. He testified that such conditions can lead to eutrophication, which stimulates plant growth in bodies of water, thus depleting dissolved oxygen. Dr. Richardson conceded that the ponds in the 2003 easement area "offer potential habitat for fish and amphibians" and the quality of the water "would not preclude some of the native aquatic species from utilizing these ponds". However, he testified that he saw no fish or amphibians evident in the 2003 easement ponds. Petitioners' expert Dr. Luken testified generally that the various ponds of the 2003 easement provide

[*32] "critical habitat for amphibians, fish, reptiles, and birds", but he, likewise, did not actually testify that he observed any specific plants or wildlife in the 2003 easement pond edges.

Dr. Richardson concluded, as with the ponds, that the land areas of the 2003 easement property provide poor habitat for plants and wildlife. Petitioners contend that the 2003 easement property, including the rough, fairways, greens, and tees, provide a relatively natural open space for foraging, migration and feeding of animals such as the Eastern Fox Squirrel, southern flying squirrels, owls, coyotes, red foxes, raccoons and opossums. Dr. Richardson, however, testified that there are no natural fruits and seeds for foraging on the golf course in the 2003 easement property. It also provides no cover. Dr. Luken testified that some back yards of nearby houses may provide natural habitat that is as beneficial to the wildlife as the 2003 easement area. However, animal migration is deterred by the residential development surrounding each of the noncontiguous tracts, level of human activity, and the frequent watering. Petitioners' expert Dr. Luken testified that he never visited the property at night, and Mr. Smith could not "speak to specific species" or how they may have used different areas for roosting, feeding, or breeding.

**[*33]** In his baseline report on the 2003 easement property, Christopher Wilson of NALT wrote that "Fish Crows, Great Blue Herons, and American Kestrel were common". However there is no indication whether these species are rare, endangered, or threatened, or whether they depend on the ponds. Mr. Wilson did not himself see the American Alligator, which in any case is only observed "occasionally". As mentioned above, Mr. Wilson wrote that he heard a chorus of frogs, but these were by the "temporary" pond.

Petitioners contend that, so long as the easement area provides habitat for one threatened or endangered species, the easement satisfies the conservation purpose test. Specifically, petitioners contend that the existence of the Venus Flytraps and Pitcher Plants on the 2003 easement property are sufficient for us to conclude that the area is a significant relatively natural habitat.

Petitioners rely on Glass v. Commissioner, 124 T.C. 258. In Glass, the property donated was a "famous" roosting spot for bald eagles and the easements established a proper place for the growth and existence of Lake Huron Tansy and Pitcher's Thistle. Id. at 281. Lake Huron Tansy, Pitcher's Thistle, and Bald Eagles were all designated "threatened" at the time. The Court found that the property was in a "natural undeveloped state" and that the land in fact had a community of Lake Huron Tansy, Pitcher's Thistle, and roosting Bald Eagles. Id.

[*34] at 282. Thus, in Glass, the Court held that the taxpayers' land contributed "to protect a significant relatively natural habitat in which a fish, wildlife, or plant community, or similar ecosystem, normally lives". Id. (quoting section 1.170A-14(d)(3)(1), Income Tax Regs.); see also Butler v. Commissioner, T.C. Memo. 2012-72, 103 T.C.M. (CCH) 1359 (2012) (environmental consultants testified that one threatened species lived on property in issue and described high-quality examples of ecosystems where some rare, endangered, or threatened species normally live).

However, in the instant cases, the 2003 easement property does not provide the same level of protection as the habitat in Glass. The property in Glass was mostly undisturbed land. The 2003 easement property, unlike the property in Glass, is not in a "natural undeveloped state". The fairways, tee boxes, and greens within the 2003 easement area are sodded or planted with 419 Bermuda and Tidwarf, which are nonnative grasses and consequently do not provide a relatively natural habitat for the Pitcher Plants and Venus Flytraps. Water and soil samples taken from the Members Club Golf Course show more intensive management, i.e. nonnatural, as compared to non-golf-course areas. Respondent's expert Dr. Richardson provided photos of soil samples from the fairway on Cate 9 and the adjacent pine forest next to the fairway. The soil from the pine forest is twice as

[*35] deep, as well as different in color. Mr. Smith of NALT provided contradictory testimony over whether the Pitcher Plants and Venus Flytraps are found in the heavily managed fairways. Consequently, the 2003 easement property is not a proper place for the growth and existence of Venus Flytraps and Pitcher Plants.

Although the 2003 easement property is not ideal for the Venus Flytraps, petitioners provided photos of Venus Flytraps and Pitcher Plants actually found on the property. Nonetheless, if the plants are found only on the areas excluding the fairways, tee boxes, and greens, that area constitutes only 24% of the 2003 easement property. Even if the transition areas between the more undisturbed land and the fairways of the 2003 easement property is the ideal habitat for the Venus Flytrap, that area represents too insignificant a portion of the 2003 easement to lead us to conclude that the whole 2003 easement property is a significant natural habitat. Highlighting this fact, the NC Natural Heritage Program map in the baseline report did not identify any Venus Flytrap plants on the 2003 easement property.

Moreover, the species on the Glass property were threatened or endangered. Pitcher Plants and Venus Flytraps are rare but not designated threatened or endangered. The regulations provide that a significant habitat includes habitats

[*36] for rare plants, but we are mindful that petitioners' own documentation shows that the species on the 2003 easement property are classified only one step above "apparently secure" and do not reach the level of "[i]mperiled globally because of rarity".

Respondent contends that the 2003 easement property is not "relatively natural" because petitioners spray pesticides, insecticides, fungicides, herbicides, and fertilizers on the fairways, greens, tees, and rough. It is undisputed that the golf courses use chemicals on roughly 63% of the 2003 easement property in the operation of the golf course. Section 1.170A-14(e)(2), Income Tax Regs., provides the following guidelines regarding the use of pesticides: "[T]he preservation of * * * [land] would not qualify under paragraph (d)(4) of this section if under the terms of the contribution a significant naturally occurring ecosystem could be injured or destroyed by the use of pesticides". Accordingly, we consider whether the pesticides could injure or destroy the ecosystem of the 2003 easement property.

Respondent's expert Dr. Richardson concluded that the golf courses' use of various chemicals injures the ecosystem of the easement property. In preparing his report, Dr. Richardson reviewed various data about the 2003 easement, some which he personally collected and others provided by petitioners. As noted in his

[*37] report, the main pesticide used on the 2003 easement property, Oxadiazon, can run off when applied in porous soils such as the soil in the 2003 easement property. Dr. Richardson states that Oxadiazon runoff accumulates in bodies of water, where it is toxic to fish and aquatic invertebrates. Additionally, the main insecticide in use on the 2003 easement property is Bifenrin, which is a possible human carcinogen. Bifenrin is generally toxic to mammals and birds, but more importantly it is toxic to beneficial, nontarget species such as bees. The fungicide that is used on the 2003 easement property has negative effects on habitat as well. As mentioned above, water samples from the 2003 easement property showed reduced oxygen, increased salinity, and levels of nitrogen beyond EPA recommendations. Also, as noted above, nutrient runoff can lead to eutrophication, which stimulates plant growth in bodies of water, thus depleting dissolved oxygen.

It is clear from the testimony of Dr. Richardson that the chemicals used on the 2003 easement property promote the maintenance of nonnative flora without regard for any conservation purpose of the 2003 easement.[6] The original

---

[6]We note that petitioners' witness Conrad Broussard, who works on the golf courses at St. James Plantation, provided further support for the proposition when he testified that the goal in irrigation and the use of pesticides, fungicides, and herbicides is to keep the golf course in good condition for playing golf and to try

(continued...)

[*38] landscape of the 2003 easement area has been replaced with nonnative grasses for the golf course. The 2003 easement deed requires the owner of the property to exercise the best environmental practices "then prevailing in the golf industry", not the best environmental practices then prevailing for conservation, as might be expected if conservation was the purpose of the easement. The 2003 easement deed qualifies the owner's reserved rights, e.g., allowing the property owner to modify the golf course "provided that no such activity shall have a material adverse effect on the Conservation Purpose". However, the easement deed allows for the use of chemicals in the maintenance and operation of the golf course, and the NALT baseline and monitoring reports provide no way of assessing the possible damage caused by those chemicals. Accordingly, the 2003 easement deed does not in actuality limit the use of pesticides and chemicals that may destroy the conservation purpose.

Petitioners' expert Dr. Luken did not testify that the effects of chemicals used on the 2003 easement property were benign. Instead, Dr. Luken concluded only generally that the species he observed on the properties did not appear affected by the chemicals and that Dr. Richardson showed only that chemicals

---

[6](...continued)
to keep the turf healthy.

[*39] were used, not that they had any deleterious effect on plants or wildlife. We do not give weight to Dr. Luken's conclusion, however, because of the basis on which it is drawn. Dr. Luken determined that soil and water samples were irrelevant to characterizing natural habitat involving plants and animals. He did not take any soil or water samples from the 2003 easement property and did not analyze the samples that Dr. Richardson provided to him. Despite having published research on the varying effects of herbicides' application techniques on target and nontarget species, Dr. Luken did not investigate the types or amounts of pesticides, fungicides, fertilizer, or herbicides used on the 2003 easement property.

Moreover, when preparing the baseline report, NALT did not consider the use of chemicals on the 2003 easement property. Such a lack of investigation and consideration of chemical usage by petitioners' experts would make it difficult, if not impossible, to assess the long-term impact of chemical use on the 2003 easement property. Without any baseline documentation regarding the chemicals' effect on the 2003 easement area, there would be no way for NALT to monitor whether there was any change in soil or water conditions. We conclude from Dr. Richardson's testimony that the use of pesticides and other chemicals could injure or destroy the ecosystem and therefore runs counter to the provisions of section 1.170A-14(e)(2), Income Tax Regs.

**[\*40]** On the basis of the foregoing, we conclude that wildlife and plants are not "most likely" to be found or do not "normally live" on the 2003 easement property.

## 2. Contributory Role

Petitioners also contend that the 2003 easement property meets the requirements of the "relatively natural habitat" purpose and cite section 1.170A-14(d)(3)(i), Income Tax Regs., which provides that "[s]ignificant habitats and ecosystems include * * * natural areas which * * * contribute to, the ecological viability of a local, state, or national park, nature preserve, wildlife refuge, wilderness area, or other similar conservation area".

The 2003 easement was designed in part to contribute to a wider set of easements that St. James Plantation issued to NALT. Specifically, parts of the 2003 easement property are adjacent to the Middle Swamp easement. For the 2003 easement to qualify as a significant habitat and ecosystem because of its contributory benefits to the Middle Swamp, therefore, the 2003 easement property must, in the terms of the regulation, be a "natural area" that "contributes to" the Middle Swamp, and the Middle Swamp must be a "nature preserve, wildlife refuge, wilderness area, or other similar conservation area". Id.

**[*41]** Petitioners have presented evidence that the Middle Swamp and other undeveloped areas within the St. James Plantation rise to the level of a "wilderness area or other similar conservation area". We cannot conclude, however, that the 2003 easement property is a "natural area" that "contributes to" the Middle Swamp or surrounding undeveloped areas. We reiterate our analysis above which explains why the 2003 easement not only does not qualify as a "relatively natural habitat" but also does not quite qualify as a "natural" habitat. A large portion of the 2003 easement property is planted with nonnative grass, the ponds do not exist in a relatively natural state, and the native forests that do remain on the 2003 easement property are at risk of removal pursuant to the terms of the 2003 easement deed.

Moreover, the 2003 easement property does not act as a "wildlife corridor" or "sink" for any species as petitioners contend. There are no natural fruits and seeds for foraging or cover from humans or predators, and there are barriers to animal migration such as the surrounding homes, human activity, and nightly watering. Neither petitioners' expert, Dr. Luken, nor Mr. Smith could identify or testify as to any specific species that he personally observed using the 2003 easement property for nocturnal migration.

**[*42]** Petitioners contend that the state of the easement area is irrelevant so long as it can act as a buffer to a nearby significant habitat. Petitioners rely on section 1.170A-14(f), Example (2), Income Tax Regs., which states in pertinent part as follows:

> A qualified conservation organization owns Greenacre in fee as a nature preserve. Greenacre contains a high quality example of a tall grass prairie ecosystem. Farmacre, an operating farm, adjoins Greenacre and is a compatible buffer to the nature preserve. Conversion of Farmacre to a more intense use, such as a housing development, would adversely affect the continued use of Greenacre as a nature preserve because of human traffic generated by the development. The owner of Farmacre donates an easement preventing any future development on Farmacre to the qualified conservation organization for conservation purposes. Normal agricultural uses will be allowed on Farmacre. Accordingly, the donation qualifies for a deduction under this section.

The 2003 easement in the instant cases and Farmacre in the regulation's example, however, are distinguishable. The 2003 easement property is not a "compatible buffer" to the Middle Swamp or the nearby undeveloped land in the way that Farmacre is to Greenacre. Most of the 2003 easement property is surrounded by a row of houses overlooking the golf course. The 2003 easement property therefore cannot provide a buffer since development already exists between the easement area and the other natural areas. The one area that is not separated by houses abuts the Middle Swamp and constitutes roughly one-third of

[*43] the 2003 easement property. However, Dr. Luken's report does not identify the Middle Swamp as a beneficiary of the 2003 easement. Instead, his report identifies Green Swamp Preserve and Boiling Springs, neither of which is on the 2003 easement property or adjacent to it.

Additionally, respondent's expert Dr. Richardson identified heavy human traffic on and around the golf course as one feature of the 2003 easement property that diminishes the benefits of a "buffer". Example (2) in the regulation specifically alludes to the increased human activity in Farmacre, if it were developed, as a detriment to Greenacre. In the instant cases, as it would be with Farmacre, the 2003 easement property's human activity level is a detriment, not a benefit, to the adjacent property. We conclude from the record that, as a whole, the 2003 easement property does not "contribute" to any "conservation area" nearby.

### 3.    Retained Rights

Section 1.170A-14(e)(2), Income Tax Regs., prohibits inconsistent use of the contributed easement and provides that a deduction will not be allowed if the contribution would accomplish one of the enumerated conservation purposes but would permit destruction of other significant conservation interests. Respondent

[*44] contends that operating a golf course is inherently inconsistent with the conservation purpose of protecting relatively natural habitat.

However, we do not need to decide in the instant case whether an operating golf course is inherently inconsistent with conservation purposes under section 170(h). To implicate section 1.170A-14(e)(2), Income Tax Regs., the contributed easement must, as a threshold, have a qualifying conservation purpose. As we have concluded above that the 2003 easement property does not preserve a relatively natural habitat, we need not address the issue of whether an operating golf course is inherently inconsistent with the conservation purpose of preserving a significant relatively natural habitat.

B. 2005 Easement

1. Independent Conservation

The 2005 easement, while it would appear to be a stronger case for petitioner Reserve Development Co., suffers from the same problems as the 2003 easement. Respondent's expert Dr. Richardson estimates that 32% of the 2005 easement property comprises "undisturbed woodland", which is similar to the stipulated exhibit showing 37.4% of the easement area covered by "wetlands". Petitioners' expert Dr. Luken testified to the presence of longleaf pine remnants on the 2005 easement, and some of the 2005 easement photographs show lusher

[*45] undisturbed areas. However, those same photographs show the reemergence of mowed grass a short distance away, highlighting the narrow character of many of such tree clusters.

As with the 2003 easement property, many of the trees on the 2005 easement area are at risk of removal because the 2005 easement deed allows for the removal of any trees within 30 feet of the fairway and for the benefit of building certain structures. Dr. Luken repeats his assessment that the longleaf pine remnants are "protected by housing development on one side and fairways on the other". NALT categorized the "primary adjacent land" as residential or golf. At least half of the 2005 easement property's borders appear to abut residential lots, and many of the longleaf pines are placed on or at the edge of houses' backyards.

We reiterate our analysis above regarding the 2003 easement: Dr. Luken conceded that longleaf pine should be protected from development in general, and there is a generous amount of development surrounding the 2005 easement area. As with the 2003 easement property, Dr. Luken references the management that he "suspects" goes on to "remove[] woody plants and encourage[] the growth of grasses and herbs" with the goal of mimicking prescribed burning of the 2005 easement property. NALT also highlighted the benefits of "active forest

[*46] management". Yet there is no management plan to mimic prescribed burning or preserve the longleaf pine areas on the 2005 easement property.

Petitioner contends that the 2005 easement property includes portions of Polly Creek and an unnamed tributary of Beaver Dam Creek. However, Dr. Richardson directly refutes that contention, and none of the maps submitted to the Court identify either of those bodies of water. Additionally, petitioner contends that the ponds provide the necessary "edge" for many plants to thrive. Such habitat could be significant because the 2005 easement property is found within the Boiling Springs Lake Complex. Although Dr. Richardson acknowledged that the ponds theoretically "offer habitat for native fish and amphibians", he qualifies that statement with "none of these species were seen or heard on the site visit". Dr. Richardson observed that the 2005 easement ponds have decreased plant diversity compared to the adjacent Wetlands II easement ponds because they are isolated in pockets separated by the golf course, houses, and concrete path. Dr. Richardson included photographs in his report comparing the edges on the 2005 easement property and Wetlands II, and the difference is compelling. One photograph shows a house built on the edge of one of the ponds, precluding any potential for a natural transition area. The photographs in the NALT baseline and compliance reports also show sparse edges.

[*47] As with the ponds on the 2003 easement, eutrophication is a concern because the same chemicals are used on both easement properties' golf courses. We conclude that the lack of an edge and the risk of the chemical use means that the ponds do not exist in the kind of natural state that would provide a significant natural habitat for plants and wildlife. Moreover, there is no aquatic features management plan, which the NALT baseline report recommended.

Dr. Richardson observed very little wildlife on the 2005 easement property. The only birds he saw were geese, which St. James Plantation attempts to "control", i.e., eliminate from the 2005 easement property, using a border collie. Squirrels may run through the golf course on the 2005 easement property, but there is no evidence that the "Southern Fox Squirrels" identified by Dr. Luken and Dr. Richardson are a species of "concern". The squirrels may in fact be "Eastern Fox Squirrels" as NALT's reports suggest, but even then, there is no indication that they are threatened or endangered by national standards. Rather, the Eastern Fox Squirrel is designated "significantly rare" by the State of North Carolina. NALT does not list the squirrel as a "special status species" on reports assessing the 2005 easement. The NALT report mentioned the Red-Cockaded Woodpecker but stated only that the 2005 easement area provided the "potential" for a habitat. Petitioners contend that animals use the 2005 easement property at night, but

**[*48]** neither Dr. Luken nor NALT representative Mr. Smith ever observed the area at night, and Mr. Smith could not testify as to specific species or how they may have used one area for "roosting or feeding, and another area for breeding" and saw no denning sites.

Mr. Smith testified that on his most recent visit he saw a Bald Eagle fly overhead while he was on the 2005 easement property. In Glass v. Commissioner, 124 T.C. at 281, the testimony established that the property there in issue was "famous" as a roosting spot for eagles. In the instant cases, however, there is no evidence that Bald Eagles roost on the 2005 easement property. We do not equate one sighting of a Bald Eagle flying over the property with a conclusion that the area is "famous" as a roosting spot for eagles.

Roughly half of the 2005 easement property supports populations of Venus Flytraps and Pitcher Plants. While the plants cannot grow on the fairways or mowed parts of the rough, they can and do grow on the 53% of the 2005 easement property designated "other" and "wetlands". Such facts, however, are insufficient for us to conclude that the 2005 easement property qualifies as a "significant relatively natural habitat". As discussed above, this partial provision of a proper place for growth is insufficient to justify protecting the entire easement area, and

[*49] the status of Venus Flytraps and Pitcher Plants is not sufficiently dire to qualify as "imperiled".

Petitioners presented evidence that an American Alligator, federally designated threatened, frequents two golf course holes. The NALT reports are unclear, however, about where the American Alligator has been seen. The reports cover several golf courses and specify only the holes by which the Alligator has been seen, not which golf course. Most importantly, in the instant cases, respondent has shown that the 2005 easement property is not "relatively natural" because most species cannot use it as a travel corridor, much less a habitat; the soil quality differs from that of surrounding undeveloped areas; the ponds lack edge; many of the protected flora are at risk of removal; and the operators of the golf course apply a variety of chemicals to the area without consideration of their impact on the environment.

### 2. Contributory Role

Dr. Luken determined that, "when taken as a whole the * * * [2005 easement property and Wetlands II habitats] represent the full range of ecological communities typically found in the Carolina bay wetland to upland complex". We think that such a statement misses the point of the contributory role qualification. The 2005 easement property does not provide sufficient contributory benefits to

**[\*50]** qualify as a "significant natural habitat" by virtue of its proximity to the Wetlands II easement. Of the 2005 Easement property's three tracts, only one portion of one tract directly borders Wetlands II. Dr. Richardson explicitly countered each of the contributory benefits petitioners contend the 2005 easement property provides to the Wetlands II easement.

As with the 2003 easement property, petitioners contend that the state of the easement area is irrelevant so long as it can act as a buffer to a nearby significant habitat. See sec. 1.170A-14(f), Example (2), Income Tax Regs. The 2005 easement property and Example (2) of Farmacre in the regulations, however, are distinguishable. While Wetlands II may be a high-quality example of undeveloped land in the Cape Fear Arch, the 2005 easement property is not a "compatible buffer" to Wetlands II in the way Farmacre is to Greenacre in the regulation's Example (2). Petitioners contend that the 2005 easement property provides wildlife corridors that benefit Wetlands II and that we should evaluate the 2005 easement property as a whole to determine how it contributes to the Carolina Bays ecosystem. However, in that case we would also consider the houses separating the 2005 easement from the Carolina Bays. The houses isolate parts of the 2005 easement property (e.g., holes 2, 8 and 7) from Wetlands II and other undeveloped land. Dr. Richardson testified that the housing lots, daily

[*51] presence of humans, concrete paths, and lack of fruits and seeds for foraging reduce the 2005 easement property's contribution as a wildlife corridor. Additionally, the same chemicals are applied to the 2005 easement property golf course as to the 2003 easement property golf course, so there are risks of chemical runoff. On the basis of our analysis above and the record as a whole in the instant cases, we conclude that the 2005 easement property does not provide a contributory benefit to the Wetlands II easement.

### 3. Retained Rights

As with the 2003 easement property, we need not decide with respect to the 2005 easement property whether an operating golf course is inherently inconsistent with conservation purposes of preserving a relatively natural habitat under section 170(h). Because we have concluded that the 2005 easement property is not a relatively natural habitat, petitioners do not meet the threshold requirement of qualifying for a conservation purpose. We therefore need not determine whether any inconsistent use on the 2005 easement property negates any qualification under section 170(h). See sec. 1.170A-14(e)(2), Income Tax Regs.

**[\*52]** V.     <u>Open Space</u>

We next address whether either the 2003 or the 2005 easement property qualifies for the conservation purpose of preserving open space pursuant to section 170(h)(4)(A)(iii)(I) or (II).  Pursuant to that section, the easement must either be pursuant to a clearly delineated Federal, State, or local government conservation policy, sec. 170(h)(4)(A)(iii)(II), or be for the scenic enjoyment of the general public, <u>id.</u> subdiv. (I).  In either case the preservation of open space must also yield a significant public benefit.  Sec. 170(h)(4)(A)(iii); sec. 1.170A-14(d)(4), Income Tax Regs.  As noted above, we conclude that petitioners did not produce any credible evidence with respect to whether either of the easements satisfies the conservation purpose of preserving open space, and therefore the burden of proof remains with petitioners and does not shift pursuant to section 7491(a).

Petitioners have failed to establish any clearly delineated governmental policies that apply to either easement area.  The baseline documents for both of the easements list several North Carolina laws but include no explanation for how the areas contribute to the purposes stated in those laws.  Petitioners do not provide any analysis, nor do they mention any government policies in their briefs, and so we deem the clearly delineated conservation policy argument abandoned.

[*53] The preservation of land may be for the scenic enjoyment of the general public if "development of the property would * * * interfere with a scenic panorama that can be enjoyed from a park, nature preserve, road, waterbody, trail, or historic structure or land area, and such area or transportation way is open to, or utilized by, the public." Sec. 1.170A-14(d)(4)(ii), Income Tax Regs. Scenic enjoyment is evaluated by considering all pertinent facts and circumstances germane to the contribution. Id. While the entire property does not have to be visible to the public, the benefit from the donation may be insufficient to make a deduction allowable if only a small portion of the property is visible to the public. Id. subdiv. (ii)(B).

In the instant cases, petitioners have failed to establish that either easement area exists for the scenic enjoyment of the general public or yields a significant public benefit. See sec. 170(h)(4)(A)(iii). To access any of the golf courses, a visitor must be a member of St. James Plantation or an invited guest of a member. A large portion of the 2003 and 2005 easement properties is covered by golf courses. The public may be able to drive into St. James Plantation, but guards at the three gate houses control access to the development. Because the parties have failed to present any evidence regarding the guards' criteria for allowing people to

[*54] enter, we have no basis on which to conclude that the general public has access to St. James Plantation roads, which would provide access to the easement areas.

Petitioners contend that the regulations require only that the public have visual access, not physical access. See sec. 1.170A-14 (d)(4)(ii)(B), Income Tax Regs. However, the record is devoid of any evidence that the public has even visual access. We are unable to conclude from the record that the easement areas are visible from public highways or waterways. Petitioners contend that the general public does have visual access to the easement areas, regardless of the presence of guards, because the areas are visible from the roads within St. James Plantation, and most of the population of the Town of St. James lives within St. James Plantation. We are not persuaded. We do not impute access to St. James Plantation to the public at large simply because most of the town population lives within St. James Plantation. Moreover, both easement areas are ringed by houses, suggesting that even if a visitor gained access to the easement areas, scenic enjoyment of the easement areas from the St. James Plantation roads would be limited. These barriers to visual access could be a likely reason that neither the 2003 easement deed nor the 2005 easement deed lists the "scenic enjoyment of the general public" as a conservation purpose.

**[*55]** Preservation of land may be for the scenic enjoyment of the general public if development of the property would interfere with a scenic panorama that can be enjoyed from the local landscape. Id. subdiv. (ii). However, as we discussed above regarding the protecting natural habitat purpose, the record establishes that most of the easement areas do not preserve the scenic character of the local landscape. While there are patches of native vegetation and wildlife, golf courses and the homes surrounding much of each easement area interrupt the natural scenic character. The easement areas are primarily man made and are neither natural nor historic.

Petitioners have failed to present any evidence showing that the easements were made pursuant to a clearly delineated government conservation policy or for the scenic enjoyment of the general public. Considering all facts and circumstances, we conclude that petitioners have not met their burden of proving the 2003 easement and the 2005 easement, or either of them, preserve open space as defined by section 170(h)(4)(A)(iii).

VI.  Penalties

Respondent determined that petitioners were liable for 20% accuracy-related penalties under section 6662(a) and (b)(1), (2), and (3) for underpayments due to (1) negligence or disregard of rules or regulations, (2) substantial

[*56] understatements of income tax, or (3) substantial valuation overstatements, and, to the extent that a portion of any underpayment was attributable to a gross valuation misstatement, an increased penalty of 40% under section 6662(h). In any court proceeding with respect to the liability of an individual, the Commissioner bears the burden of production on the applicability of the accuracy-related penalty in that he must come forward with sufficient evidence indicating that it is proper to impose the penalty. See sec. 7491(c); see also Higbee v. Commissioner, 116 T.C. at 446. In the case of a partnership, however, it is not clear whether the Commissioner bears the burden of production. See Seismic Support Servs., LLC v. Commissioner, T.C. Memo. 2014-78, at *9 n.11 (discussing the Court's varied treatment of whether section 7491(c) is inapplicable where the taxpayer is not an "individual"). However, in the instant cases, even if respondent has met his burden of production, we conclude that petitioners are not liable for the penalty because petitioners acted with reasonable cause.

Petitioners contend that they qualify for the reasonable cause defense of section 6664(c)(1). Pursuant to that section, accuracy-related penalties under section 6662 do not apply to any portion of an underpayment for which a taxpayer establishes that he or she: (1) had reasonable cause and (2) acted in good faith. Whether taxpayers acted with reasonable cause and in good faith depends on the

[*57] pertinent facts and circumstances, including their efforts to assess their proper tax liabilities, their knowledge and experience, and the extent to which they relied on the advice of a tax professional. Sec. 1.6664-4(b)(1), Income Tax Regs.

Reliance on professional advice may constitute reasonable cause and good faith, but "it must be established that the reliance was reasonable." Freytag v. Commissioner, 89 T.C. 849, 888 (1987), aff'd on another issue, 904 F.2d 1011 (5th Cir. 1990), aff'd, 501 U.S. 868 (1991); sec. 1.6664-4(b)(1), Income Tax Regs.;. Reliance on an adviser is reasonable if (1) the adviser had the expertise to justify reliance, (2) the taxpayer provided all necessary and accurate information to the adviser, and (3) the taxpayer actually relied in good faith on the adviser's judgment. Neonatology Assocs., P.A. v. Commissioner, 115 T.C. 43 (2000), aff'd, 299 F.3d 221 (3d Cir. 2002). Advice includes "any communication * * * setting forth the analysis or conclusion of a person, other than the taxpayer, provided to (or for the benefit of) the taxpayer and on which the taxpayer relies, directly or indirectly, with respect to the imposition of the section 6662 accuracy-related penalty." Sec. 1.6664-4(c)(2), Income Tax Regs.

We agree with petitioners that they acted with reasonable cause and in good faith. Petitioners worked with NALT to formulate a plan for creating the conservation easements. The NALT employees who inspected the easement areas

[*58] and testified at trial hold degrees in biology and were qualified to make assessments about preserving the natural attributes of St. James Plantation. Petitioners provided NALT all the necessary and accurate information by making the land available for on-site assessments and inspections. We conclude that petitioners relied in good faith on NALT's advice and judgment that placing easements on the areas NALT deemed worthy of protection complied with the conservation purpose of protecting relatively natural habitat.

In the case of a substantial or gross valuation overstatement with respect to property for which a charitable contribution deduction was claimed under section 170, a taxpayer must also show that the claimed value of the property was based on a "qualified appraisal" by a "qualified appraiser" and that the taxpayer made a good-faith investigation of the value of the property. Sec. 6664(c)(2).

The record supports petitioners' contention that they relied on a "qualified appraisal" by a "qualified appraiser". See Dunlap v. Commissioner, T.C. Memo. 2012-126 (reliance on qualified appraisal prepared by qualified appraiser constituted reasonable cause); 1982 East, LLC v. Commissioner, T.C. Memo. 2011-84 (considering taxpayer's appraisal as evidence of reasonable cause and good faith); Evans v. Commissioner, T.C. Memo. 2010-207. Attached to the Forms 1065 filed by the Members Club and the Reserve Club were appraisals by

[*59] Mr. Sauter. Respondent does not contest that the appraisals were "qualified appraisals" under section 170(f)(11)(E)(i) which were prepared by a "qualified appraiser" under section 170(f)(11)(E)(i)-(iii). In attaching the appraisals to their tax returns, petitioners demonstrated good-faith reliance on the appraisals.

Furthermore, the testimony of Ms. Wright, who has experience in commercial real estate and found no inconsistencies in Mr. Sauter's report, supports the conclusion that petitioners made a good-faith investigation of the values of the easements and relied on the appraisals in good faith. We conclude that petitioners' reliance on Mr. Sauter, NALT, and other advisers satisfies the reasonable cause defense requirements of section 6664(c)(1). Consequently, we hold that petitioners are not liable for the accuracy-related penalties under section 6662.

VII. Conclusion

Petitioners have not satisfied the requirements of section 170(h) and, therefore, are not entitled to deductions for qualified conservation contributions. They are not, however, liable for the accuracy-related penalties or gross valuation misstatement penalties. We have considered all of the parties' contentions, arguments, requests, and statements. To the extent not discussed herein, we conclude that they are meritless, moot, or irrelevant.

**[\*60]** To reflect the foregoing,

<u>Decisions will be entered under</u>

<u>Rule 155</u>.