# United States Tax Court

T.C. Memo. 2026-36

KIMBERLY ROAD FULTON 25, LLC, KIMBERLY ROAD
MANAGER, LLC, TAX MATTERS PARTNER,
Petitioner

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

SOUTH FULTON PARKWAY 58, LLC, SOUTH FULTON 58
MANAGER, LLC, TAX MATTERS PARTNER,
Petitioner

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

————

Docket Nos. 17852-21, 23934-21.[1]                      Filed May 4, 2026.

————

*Anson H. Asbury*, *Robert B. Gardner III*, *Ethan J. Vernon*, *Scott C. St. Lifer*, *Caitlin S. Colley*, and *Lauren H. White*, for petitioners.

*Andrea L. Medley*, *Yvette Nunez*, *Sheila R. Pattison*, *Roberta L. Shumway*, *Dustin R. Webber*, and *Bethany E. Ortiz*, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

HOLMES, *Judge*: Jeffrey Grant's grandfather taught him a saying that has stuck with him all his life: "Sometimes, a fast nickel is worth more than a slow dime." A self-identified "land man," Grant has

---

[1] We consolidated these cases for trial, briefing, and opinion.

[*2] made a career of buying vacant land in Georgia and quickly turning it into enough "fast nickels" to make a good living.

These cases involve two parcels of vacant land near Atlanta, bought by Grant and partnerships in which he held interests. They paid $500,000 for one and $198,000 for the other. They turned these into charitable deductions of conservation easements that they valued at nearly $30 million combined.

The Commissioner says this was way too many fast nickels.

FINDINGS OF FACT

I.    *The Properties*

The conservation easements at issue here were placed on two pieces of land in the Atlanta area: Kimberly Road and South Fulton.

A.    *Kimberly Road*

The Kimberly Road property is 25.4 acres divided between two tracts in southwestern Atlanta. It's approximately 10 miles west of Atlanta's downtown but was vacant during 2017, the year at issue. The property contains mature oak-hickory-pine forest and is zoned RG-3 in the City's zoning classification, which the partnerships say is valuable because it allows for 18 to 24 housing units per acre.

Grant had a lengthy history with this land. He first bought it in 2008 with a loan from a Georgia bank and put it in Kimberly Road, LLC. He thought it could be developed because he saw water lines and manholes on the property. This was another value purchase for Grant, as he obtained a 70% loan-to-value construction loan on the property from the Republic Bank of Georgia.

But then the Great Recession hit, the bank faltered, and the FDIC took over the loan and sold it to another financial institution. The new lender wanted the principal to be repaid immediately. That didn't happen, so Grant lost the property to foreclosure. A Grant-affiliated entity, Golden Eagle Capital Investments, LLC, then reacquired the property for all of $500,000 in 2016. Grant says the seller had overlooked the property's RG-3 zoning.

[*3]   B.   *South Fulton*

The South Fulton property consists of three tracts that total roughly 130 acres in the Atlanta suburb of Union City.  It's located off the South Fulton Parkway, which was built in 2009 to expand development in the area, though this property didn't have access to that road in 2017.  South Fulton was vacant land, like Kimberly Road.  Like Kimberly Road, it is covered by oak-hickory-pine forest.

Grant bought the South Fulton property in 2016 through one of his entities, Southern Consulting Services, LLC, in a bundle with two other properties in Alabama and South Carolina for $350,000.  Grant bought the out-of-state land sight unseen, but for him it was worth it because the South Fulton property was zoned Town Center Mixed Use by Union City.  Grant found this valuable because it allows for a mix of residential, commercial, and industrial uses.  Shortly thereafter he transferred the property to South Fulton Parkway 58, LLC.

II.   *The Syndication*

A.   *Jeffrey Grant*

Grant is a high school graduate who worked his way from trucking to running a business moving pallets between the paper-supply companies that dot his native Georgia.  He sold that business and used part of the proceeds to buy land in Henry County, Georgia, for $400 an acre.  Grant quickly flipped that parcel to an individual interested in its timber for a 13% profit, and ever since then he's made a living buying properties cheap and selling at a profit.

And that's just how Grant deployed his grandfather's "Fast Nickel" maxim.  Teaming up with an area doctor and then his widow,[2] Grant received capital to buy undervalued properties that were favorably zoned or for which he could obtain favorable rezoning.  He'd commission engineering plans for potential developments, hold the land, and then sell it to developers.  Grant typically doesn't develop the land himself, though he does do so occasionally.

---

[2] This widow is Qin Meng, who was married to Grant's former orthopedic surgeon—the man who Grant says saved his right hand after a trucking accident. Meng remained partners with Grant by way of her co-ownership (along with Southern Consulting Services) of Golden Eagle Capital Investments, LLC.

**[\*4]**   B.   *Dan Carbonara*

Whereas Grant learned how to transact real estate from the "school of hard knocks," Daniel Carbonara received his education from such blue-chip institutions as Duke University, KPMG, and Credit Suisse, and he holds a Series 7 license for securities transactions from the Financial Industry Regulatory Authority.  He formed Old Ivy Capital, LLC, a smaller private equity firm, in Atlanta in 2011 as a vehicle to obtain and syndicate low-income housing credits.  Carbonara owned Old Ivy in its entirety during 2017.

The credits Carbonara wanted to sell require land, and Jeffrey Grant finds land.  An Old Ivy client referred Carbonara to Grant in 2014.  Grant liked working with Carbonara because of his decisiveness.

C.   *Putting the Deals Together*

1.   *Entity Formation*

At this point Grant had already owned and lost the Kimberly Road property, but Carbonara says he wasn't aware of this history.  Within a couple years, however, Kimberly Road Fulton 25, LLC (Kimberly Road)[3] was organized as a Georgia limited liability company.  Upon its inception, its members were NY HY Management, Inc., and an investor named Qingjun Sun.  Its manager was Golden Eagle Capital Investments, LLC—the same entity that Grant later used to reacquire the Kimberly Road property.[4]

---

[3] We'll refer to the partnership in docket number 17852-21 as "Kimberly Road" throughout.  We'll do the same for the "South Fulton" partnership in docket number 23934-21.

[4] We'll likewise use the partnerships' names followed by "property" or "land" throughout when referring to the subject properties in these cases.

**[\*5]**

Kimberly Road Ownership Structure at Formation



After the land was reacquired in late 2016, NY HY Management, LLC, and Sun transferred the majority of their interests in Kimberly Road to Kimberly Road Investments, LLC (Kimberly Road Investments) and Kimberly Road Manager, LLC (Kimberly Road Manager). Kimberly Road Manager was wholly owned by Carbonara by way of Old Ivy. Both these new members were organized as Delaware limited liability companies.

Kimberly Road Ownership Structure after Dec. 20, 2017



**[\*6]** South Fulton was organized and acquired its property in much the same way. It was formed as a Georgia limited liability company in October 2016. It was originally owned by Fortune Tai Investments, LLC, and Golden Eagle Capital Investments, LLC, with the latter also serving as its manager.

South Fulton Ownership Structure at Formation



These original owners then transferred the majority of their interests to South Fulton Manager, LLC (South Fulton Manager)—which was organized under the laws of Georgia—and Emerald Acquisitions 2017, LLC (Emerald Acquisitions). South Fulton Manager was in turn owned by Carbonara by way of Old Ivy. Grant's Southern Consulting Services, LLC, deeded the South Fulton property to South Fulton in October 2016.

**[*7]**



South Fulton Ownership Structure after Dec. 26, 2017



### 2.    *Finding Investors*

With the legal structures in place, Carbonara next had to go about finding investors for the land projects.  One of these, Aaron Kowan, was an attorney who specialized in syndications and who ran Emerald Acquisitions as a private equity fund.  Kowan and Emerald Acquisitions had completed previous deals with both Carbonara and Grant. Including Emerald Acquisitions on the South Fulton deal was a way for that fund's investors to get in on the potential tax benefits.  As for the Kimberly Road property, it acquired investors by way of Kimberly Road Investments, which was owned by Kimberly Road Manager, NxGen MDX, LLC, and Louis Joseph.

Carbonara engaged the Malik Law Group, LLC—with assistance from Kowan's former firm—to draft private-placement memoranda (PPMs),[5]  operating agreements, and membership-unit purchase agreements for these investors for both projects.  Carbonara and Kowan found it a good practice to include in their PPMs information akin to

---

[5] Under a safe harbor of section 4(a) of the Securities Act of 1933 and its regulations, some entities and investment funds can offer securities to accredited investors (commonly through PPMs) without jumping through many of the SEC's registration hoops.  15 U.S.C. § 77d; 17 C.F.R. § 230.506 (2021).

[*8] what one would find in a prospectus, and they did so with both the Kimberly Road and South Fulton partnerships. These disclosures included the Commissioner's inclusion of syndicated conservation easements as "listed transactions." They also forecasted that the partnerships would own investments that would promote environmental responsibility while generating a targeted return of 145% of each investor's investment.

Carbonara also engaged the law firm Baker, Donelson, Bearman, Caldwell & Berkowitz, PC, to advise the partnerships about the tax effects of the expected conservation easement transactions. Baker Donelson looked at the LLCs' operating agreements and the membership-interest purchasing agreement and drafted opinion letters on the transactions. These letters blessed the transactions, but they did not opine on the proper values of the subject properties to be reported on the partnerships' returns.

There was one final bit of costume design for this ensemble. Carbonara drafted for members of Kimberly Road both a development plan and a conservation-easement plan for the property. The development plan envisioned a 600-unit senior and assisted-living facility (ALF) with an initial capital contribution of $2.3 million. Adam Price, a professional engineer who is the managing partner of the Atlanta-based engineering firm Falcon Design Consultants, drafted a concept plan for this potential development and a boundary survey of the Kimberly Road property.

It seems highly implausible that the partnership would vote for these plans for development. Grant had previously considered developing the property but, like everyone who had attempted to do so, he lost both fast nickels and slow dimes in the process. Were this a good-faith consideration of trying, yet again, to develop the land, it still lacked key elements; for example, there was no grading plan for the property. The resulting proposal was for a 450-unit ALF apparently built on top of a rugged, 50-foot cliff in a state where the largest number of units in an ALF is 214. That the partnership would have voted for this plan seems even more unlikely given that one investor, Louis Joseph, testified that he was altogether unfamiliar with the development plan. The timeline also shows that Kimberly Road's baseline documentation report was prepared months before the partners ever voted for the conservation-easement plan.

**[\*9]** There is no surprise, then, that the partners voted for the conservation-easement plan on December 27, 2017. The same process took place with the South Fulton investors. Its development plan included a combination of mixed-use, multifamily-housing, and commercial/retail/office development in each of that property's three tracts, for an initial investment of a little over $2 million. These investors also voted for a conservation-easement option on December 27, 2017.

### 3. *Granting the Easements*

The easements restricted how the partnerships could use the properties by limiting development on them. They didn't contain any clauses granting reversionary interests in the properties to the partnerships. They did reserve certain rights, though. One of these was to permit logging of up to half of the trees on the properties every five years. South Fulton's also allowed its owners to use the property for agriculture, forestry, and recreational activities such as hunting and horseback riding. The Commissioner says these reserved rights mean the easements weren't granted exclusively for conservation purposes within the meaning of section 170(h)(1)(C) and (5)(A).[6]

The donation of a conservation easement under section 170 needs a donee. The partnerships chose Southern Conservation Trust, Inc. (SCT), which the parties agree was a qualified charitable organization under section 501(c)(3) during the year at issue. The agreement with SCT required that SCT be allowed on the properties to monitor them so it could confirm that the terms of the easements were being adhered to.

SCT prepared land-management plans for both properties that described how the organization would monitor them and recommended corrective actions—such as removing trash—to preserve them. The partnerships put cash aside to hire a sort of on-again-off-again warden, and he posted "No Trespassing" signs and removed trash that had accumulated on the properties.

SCT also played a role in documenting the easements. Section 170's regulations require "baseline documentation reports" (known as BDRs) that describe the property's conservation value so that they meet

---

[6] Unless we state otherwise, all statutory references are to the Internal Revenue Code, Title 26 U.S.C. (I.R.C. or Code), in effect at all relevant times, and all regulation references are to the Code of Federal Regulations, Title 26 (Treas. Reg.), in effect at all relevant times.

[*10] the Code's "perpetuity" requirement. I.R.C. § 170(h)(5)(A); Treas. Reg. § 1.170A-14(g)(5). SCT engaged two different third-party conservation consultants to prepare Kimberly Road's and South Fulton's BDRs.

4. *Appraising and More Papering*

More papering would be needed to attempt to document the deal. The partnerships hired Thomas Spears, an appraiser with Global Valuation and Consulting, Inc., to appraise both properties. Grant provided Spears with the deeds of easement, the Falcon Design concept plans, and the boundary surveys to inform his appraisals. Spears appraised the Kimberly Road property at $9.9 million, and the South Fulton property at $16.3 million, before the easements were granted.

The partnerships' operating agreements and PPMs disclosed administrative and management fees to Grant and Carbonara for setting up the transactions. After the members of the partnerships voted for the conservation options in December 2017, Carbonara worked with the investors and their financial advisors to close the deal by the end of that year. This then led to the circulation of various forms to document the investors' respective tax deductions.

III. *Tax Return Preparation and Reporting*

Both Kimberly Road and South Fulton are partnerships for tax purposes and filed partnership returns. Carbonara, through Old Ivy, hired Carr, Riggs, & Ingram, a CPA firm, to prepare the partnerships' returns. They included with their Forms 1065, U.S. Return of Partnership Income, the disclosure statements that the Commissioner requires for certain reportable transactions such as syndicated conservation easements.

Obtaining a deduction for a donation of a partial interest in real property under section 170(h) requires filing a qualified appraisal of the donated property with a return. This is done by attaching the appraisal signed by an appraiser, with a Form 8283, Noncash Charitable Contributions. Treas. Reg. § 1.170A-16.

Spears signed the appraisal portion of the returns, Form 8283, and on them stated that Kimberly Road's basis in the contributed property was about $500,000 and that he appraised it at about $9.9 million. He stated that South Fulton's basis in its property was $630,000 and that he appraised it at $15.9 million. The partners

**[\*11]** attached the Kimberly Road and South Fulton appraisals—the latter of which was also signed by Lori Coffey—to their returns as required by Treasury Regulation § 1.170A-16.

The partners hired Tammy Duke of RE Appraisal Group, Inc., to review Spears's appraisals in what appears to be an act of due diligence. Duke concluded that Spears's analyses, opinions, and conclusions in his appraisal reports were reasonable. Her review reports weren't attached to the partnerships' returns, though, and she didn't sign their Forms 8283.

Kate Pace Quattlebaum did sign the partnerships' Forms 8283. She had recently started as the director of SCT when the partnerships donated the easements to that nonprofit. In addition to the easement contributions, Kimberly Road claimed a deduction for a cash contribution of $38,766 and South Fulton claimed one for $38,500. The partnerships attached to their returns letters from SCT acknowledging receipt of these cash and noncash donations.

IV.    *The Commissioner's Response*

As we noted above, the partnerships included Forms 8886, Reportable Transaction Disclosure Statement, with their 2017 tax returns. They did so because the Commissioner by this point had promulgated I.R.S. Notice 2017-10, 2017-4 I.R.B. 544, which named syndicated conservation easement transactions as "listed transactions" under sections 6111 and 6112, and Treasury Regulation § 1.6011-4.[7]

He audited Kimberly Road and South Fulton under the rules of TEFRA, which the parties agree govern these cases.[8] The Commissioner

---

[7] We have since set aside Notice 2017-10 as having been improperly issued by the Commissioner in violation of the Administrative Procedure Act. *Green Valley Invs., LLC v. Commissioner*, 159 T.C. 80 (2022). Penalties under section 6662A are thus inapplicable here. We do note that the Commissioner has preserved in his briefs his argument that we were wrong in *Green Valley*.

[8] Before its repeal, *see* Bipartisan Budget Act of 2015, Pub. L. No. 114-74, § 1101(a), 129 Stat. 584, 625, part of the Tax Equity and Fiscal Responsibility Act of 1982 (TEFRA), Pub. L. No. 97-248, §§ 401–407, 96 Stat. 324, 648–71, governed the tax treatment and audit procedures for many partnerships. TEFRA partnerships were subject to special tax and audit rules. *See* I.R.C. §§ 6221–6234. TEFRA required the uniform treatment of all "partnership item[s]"—a term defined by section 6231(a)(3)— and its general goal was to have a single point of adjustment for the IRS rather than having it make separate partnership-item adjustments on each partner's individual return. *See* H.R. Rep. No. 97-760, at 599–601 (1982) (Conf. Rep.), *as reprinted in* 1982-2 C.B. 600, 662–63. If the IRS decided to adjust any partnership items on a partnership

[*12] issued a Notice of Final Partnership Administrative Adjustment (FPAA) in May 2021 for Kimberly Road and in July for South Fulton.

The Commissioner made the following adjustments:

| Partnership | Conservation Contribution Deduction Claimed | Conservation Contribution Deduction Allowed | Cash Charitable Contribution Deduction Claimed | Cash Charitable Contribution Deduction Allowed |
|---|---|---|---|---|
| Kimberly Road | $9,866,000 | -0- | $38,766 | $38,766 |
| South Fulton | 15,871,000 | -0- | 38,500 | 38,500 |

He also asserted penalties for gross overvaluation under section 6662(h) against the partnerships, or, in the alternative, penalties for negligence or intentional disregard of tax rules or regulations under section 6662(b)(1), for substantial understatements of income tax under section 6662(b)(2), and for substantial valuation misstatements under section 6662(b)(3).[9]

The TMPs for Kimberly Road and South Fulton timely filed petitions for readjustments of partnership items. We tried the cases in Atlanta. Appellate venue presumptively lies in the Eleventh Circuit. *See* I.R.C. § 7482(b)(1)(A).

OPINION

I.  *The Issues*

The parties settled all but five issues:

---

return, it had to notify the individual partners of the adjustments by issuing an FPAA. I.R.C. § 6223(a).

Under TEFRA, a partnership designated one of its partners as the tax matters partner (TMP) to handle any issues with the Commissioner. I.R.C. § 6231(a)(7). Affiliated LLCs, of which Carbonara is the managing member, are the TMPs in these cases.

[9] He also asserted penalties under section 6662A which, we reiterate, *Green Valley*, 159 T.C. 80, prohibits us from upholding.

**[\*13]**

- whether Kimberly Road and South Fulton were in fact partnerships and made charitable contributions;

- whether Kimberly Road and South Fulton each failed to attach qualified appraisals to their returns;

- whether the donated easements had qualified conservation purposes;

- what the values of the donated easements were; and

- whether any penalties apply.

II.  *Whether the Purported Partnerships Were* Bona Fide *and Made Charitable Contributions*

At the threshold we need to examine whether to keep treating these cases as partnership-level proceedings, and whether the deductions should be entirely disallowed for lack of donative intent. The Commissioner first says that the partnerships and their partners were motivated only by tax benefits, that seeking such benefits isn't a legitimate business purpose, and that Kimberly Road and South Fulton lacked any intent to share in profits and losses. This means, he says, the partnerships aren't *bona fide* and should be disregarded.

The Commissioner also says that Kimberly Road's and South Fulton's hunger for tax benefits means they lacked donative intent when they contributed the conservation easements. Therefore, he says, these contributions weren't "charitable" as described in section 170(a) and (c) and they therefore shouldn't be allowed any deductions.

Does the alleged absence of any business purpose or donative intent matter? Kimberly Road and South Fulton first argue that it doesn't matter if their purported partners lacked a business purpose because this dispute involves deductions for donations and not for business expenses. We agree. The Commissioner relies on *Historic Boardwalk Hall, LLC v. Commissioner*, 694 F.3d 425, 448–49 (3d Cir. 2012), *rev'g and remanding* 136 T.C. 1 (2011), which did hold that a partnership doesn't exist if the partners share neither meaningful downside risk nor upside potential in their activity. Deductions for donating property interests to a nonprofit organization are, however, specifically authorized by the Code and, like the tax credits at issue in

**[\*14]** *Historic Boardwalk,* do not require an investment or business purpose. *Id.* at 429, 452. And whether the purported partners were subjectively motivated by the tax benefits of a contribution of conservation easements is immaterial to the objective fact that they donated conservation easements on the properties to SCT. *See Mill Rd. 36 Henry, LLC v. Commissioner*, T.C. Memo. 2023-129, at \*28. Contributing the easements had an objective economic effect that limited the partnerships' rights as to the properties. *See Grodt & McKay Realty, Inc. v. Commissioner*, 77 T.C. 1221, 1236 (1981) (stating that a transaction's economic substance governs its *bona fides*); *RERI Holdings I, LLC v. Commissioner*, 107 T.C.M. (CCH) 1488, 1493 (2014). The partnerships did, in fact, put up the funds to buy interests in the properties and then donate easements on those properties to SCT. *See RERI Holdings*, 107 T.C.M. (CCH) at 1493.

The presence or absence of a subjective charitable purpose on the part of a donor is likewise immaterial. In tax law, gifts are either given or they aren't—a donor's subjective intent in giving a gift is irrelevant absent a *quid pro quo*. *Hernandez v. Commissioner*, 490 U.S. 680, 701–02 (1989); *Mill Rd.*, T.C. Memo. 2023-129, at \*28. Subjective intent can be relevant in asking whether a contribution was given in expectation of some certain specific and direct economic benefit from the recipient of the contribution. *Stubbs v. United States*, 428 F.2d 885, 887 (9th Cir. 1970). But the *sine qua non* of a charitable contribution is the act of transferring property without adequate consideration in return. *United States v. Am. Bar Endowment*, 477 U.S. 105, 118 (1986).

The Commissioner stipulated that SCT is a charitable organization under the Code. Did the partnerships' granting of conservation easements and receipt of tax benefits rise to, as the Commissioner argues, a *quid pro quo*? We think not. They granted conservation easements to SCT and received nothing in return from that organization. *Compare Hernandez v. Commissioner*, 490 U.S. at 690–91 (payments for auditing and training sessions were *quid pro quo*), *with Weitz v. Commissioner*, 56 T.C.M. (CCH) 1422, 1426 (1989) (taxpayers lacked expectation of consideration from donee).

Kimberly Road and South Fulton may have expected their contributions to give them substantial tax benefits, but SCT itself was not their source. *See Am. Bar Endowment*, 477 U.S. at 116. Only Congress was, by enacting section 170(h). We find that this makes these benefits merely incidental to the donation of the easements to SCT. *See Singer Co. v. United States*, 449 F.2d 413, 423 (Ct. Cl. 1971).

**[\*15]** III.   *Qualified Appraisal*

For donations of noncash charitable contributions of more than $5,000, the regulation requires a "qualified appraisal."  Treas. Reg. § 1.170A-13(c)(2)(i)(A); *see* I.R.C. § 170(f)(11)(C).  For an appraisal to be qualified, it must contain a description of the property in sufficient detail and of how it was acquired; the name, address, and identifying number of the appraiser; and his signature on an appraisal summary—all attached to a Form 8283.  Treas. Reg. § 1.170A-13(c)(3), (4)(ii).

That leads to the Commissioner's next argument—that the partnerships failed to support their deductions with "qualified appraisals" because they were done by appraisers who themselves should be disqualified.  And the reason they should be disqualified is that Carbonara and Grant themselves should have realized that the appraised values were much too high.  *See* Treas. Reg. § 1.170A-13(c)(5)(ii); *see also Mill Rd.*, T.C. Memo. 2023-129, at \*42.

These are procedural requirements distinct from whether an appraisal's valuation was correct or overstated—even if it was grossly overstated.  *See Kaufman v. Commissioner*, 107 T.C.M. (CCH) 1262, 1278 (2014), *aff'd*, 784 F.3d 56 (1st Cir. 2015).  We judge these requirements on whether the partnerships substantially complied with them.  *See Bond v. Commissioner*, 100 T.C. 32, 41 (1993).  And we'll look at the two appraisers that the partnerships say were qualified.

A.   *Thomas Spears*

The Commissioner says Spears's appraisals run afoul of Treasury Regulation § 1.170A-13(c)(5)(ii) because Carbonara knew or should have known that Spears's valuations were falsely overstated due to his and Grant's knowledge of vacant land prices in Fulton County.  He thinks that Carbonara and Grant fed Spears their preferred uses and values of the subject properties.

Grant, Spears, and Carbonara may have discussed the properties, and even discussed them extensively, before Spears made determinations about their values.  Such discussions would have made sense in light of Spears's having been unfamiliar in 2017 with appraising conservation easements.  After hearing his testimony and reviewing his appraisals, however, we find that a reasonable person would not expect Spears's objectivity to be fatally compromised and that he did not act solely as an advocate for the partnerships' views of the values of the properties.  *See Kaufman*, 107 T.C.M. (CCH) at 1272.

**[\*16]** That's enough for Spears's Kimberly Road appraisal, because the Commissioner doesn't point to significant procedural defects, and we therefore find that appraisal to be qualified. The Commissioner does have an additional argument for why the South Fulton appraisal was not qualified—a missing signature from Lori Coffey, an appraiser who worked with Spears on the appraisal. Coffey did fail to sign South Fulton's Form 8283. Whether this is fatal turns on whether South Fulton otherwise substantially complied with Treasury Regulation § 1.170A-13(c).

A taxpayer substantially complies with the regulatory requirements if he provides sufficient information to permit the Commissioner to evaluate his reported contribution. *Smith v. Commissioner*, 94 T.C.M. (CCH) 574, 586 (2007), *aff'd*, 364 F. App'x 317 (9th Cir. 2009). Here, Coffey signed both the South Fulton appraisal and a certification of appraisal as required by the regulation. It turns out that this certification has the same language found on the portion of the Form 8283 that the Commissioner says Coffey was required to sign.

This is not a scenario where the Form 8283 was incomplete or devoid of the property's description or appraisal information. *See id.* The partnerships didn't make one of the "common errors" of an appraisal by failing to meet an essential requirement of the Code, such as failing to get an appraisal at all, failing to fill out section B of the form, having someone without expertise in appraisals complete the appraisal, or having insufficient information in it. *Mohamed v. Commissioner*, 103 T.C.M. (CCH) 1814, 1819 (2012). We find that South Fulton substantially complied with Treasury Regulation § 1.170A-13(c).

We therefore also find that Spears's South Fulton appraisal was qualified under Treasury Regulation § 1.170A-13(c)(5). We will still weigh the information he received, his adherence to appraisal standards, and his assumptions in appraising the properties in determining whether the valuations that he arrived at were correct.

B.     *Tammy Duke*

The Commissioner also says that Duke, due to her "professional contributions" of reviewing Spears's appraisals, was required to sign the reports and the Forms 8283 for the partnerships. According to Spears and some emails, Duke suggested a few corrections to Spears's appraisals, including pointing out updated zoning for one of the properties and proposing alternative comparable sales to use.

**[\*17]**  But we didn't hear this directly from Duke because neither party called her to testify even though the Commissioner identified her as a potential witness in his pretrial memorandum.  The partnerships say this is a new issue first raised on brief that should be precluded from consideration.  *See Smalley v. Commissioner*, 116 T.C. 450, 457 n.4 (2001).

Is this a new issue as the partnerships say?  Or merely a new argument about whether the partnerships attached qualified appraisals under Treasury Regulation § 1.170A-13(c)(2)(i)(A)?  We find it's the former.  New issues require new or different factfinding, but new arguments don't.  *Sells v. Commissioner*, 121 T.C.M. (CCH) 1072, 1075 (2021).  To know the full extent of Duke's involvement would require additional factfinding.  Even if we were to consider this issue, though, we'd be inclined to find that Duke's role—based on the information we do have—was so minor as not to require her to sign the appraisals nor the Forms 8283.

IV.     *Qualified Conservation Purpose*

A.     *Background*

Donations of *partial* interests in property are generally ineligible for deductions under the Code.  I.R.C. § 170(f)(3)(A).  But there's an important exception for qualified conservation contributions.  I.R.C. § 170(f)(3)(B)(iii).  Section 170(h)(1) specifies that such a contribution must be (1) of a qualified real-property interest, (2) to a qualified organization, and (3) exclusively for conservation purposes.  *See also Atkinson v. Commissioner*, 110 T.C.M. (CCH) 550, 560 (2015).

Qualified real-property interests under section 170(h) can include property with restrictions—like easements—on the use of the property if they are made in perpetuity and otherwise meet the requirements of section 170(h)(3).  *See* I.R.C. § 170(h)(2); *Mill Rd.*, T.C. Memo. 2023-129, at \*27.

The parties stipulated that SCT is a qualified organization under section 170(h)(3) but didn't stipulate that the easements meet the granted-in-perpetuity requirement.  We'll begin, however, with the thorny issue under section 170 of whether Kimberly Road's and South Fulton's contributions were made exclusively for conservation purposes.  *See* I.R.C. § 170(h)(1)(C).

**[\*18] B.**     *Possible Conservation Purposes*

Section 170 lists various conservation purposes:

- the preservation of land for outdoor recreation or the education of the general public;

- the preservation of a relatively natural habitat of fish, wildlife, or plants, or of a similar ecosystem;

- the protection of open space that will yield a significant public benefit if it's for (1) the scenic enjoyment of the general public or (2) pursuant to a clearly delineated federal, state, or local governmental conservation policy; or

- the preservation of a historically important land area or a certified historic structure.

I.R.C. § 170(h)(4)(A).

Any one of these purposes is good enough if the donation is exclusively for conservation purposes. *See Glass v. Commissioner*, 124 T.C. 258, 280 (2005), *aff'd*, 471 F.3d 698 (6th Cir. 2006). The parties here contest whether Kimberly Road and South Fulton qualify under the second and third purposes. We look to the deeds to decide if they did. *Murphy v. Commissioner*, T.C. Memo. 2023-72, at \*42–43.

C.     *Habitat Protection*

1.     *General Principles*

One conservation purpose is "the protection of a relatively natural habitat of fish, wildlife, or plants, or similar ecosystem." I.R.C. § 170(h)(4)(A)(ii). The regulations more specifically state that the donation must protect a significant relatively natural habitat in which a fish, wildlife, or plant community, or a similar ecosystem, normally lives. Treas. Reg. § 1.170A-14(d)(3)(i).

The parties spar about the key terms "relatively," "habitat," and "significant" in the Code and regulation. Let's start with the least abstract of the three. We've defined a "habitat" in this context to mean an "area or environment where an organism or ecological community normally lives or occurs," as well as "the place where a person or thing

**[\*19]** is most likely to be found." *Glass*, 124 T.C. at 281–82 (quoting *American Heritage Dictionary of the English Language* (4th ed. 2000)).

So that's a habitat. What makes one "significant"?[10] We know that if a habitat is a home for a rare, endangered, or threatened species it is by its very nature significant. *Champions Retreat Golf Founders, LLC v. Commissioner*, 959 F.3d at 1036. The regulations offer some additional guidance:

> Significant habitats and ecosystems include, but are not limited to, habitats for rare, endangered, or threatened species of animal, fish, or plants; . . . and natural areas which are included in, or which contribute to, the ecological viability of a local, state, or national park, nature preserve, wildlife refuge, wilderness area, or other similar conservation area.

Treas. Reg. § 1.170A-14(d)(3)(ii).

The last questions in this part of the conservation catechism are: What does it mean to be a "relatively" significant habitat? How natural does the habitat need to be? Is one rare, endangered, or threatened species inhabiting the property enough? And to what level and geographic footprint of rarity is sufficient? *See Loper Bright Enters.*, 144 S. Ct. at 2296 (Kagan, J., dissenting) ("What makes one population segment 'distinct' from another? Must the Service treat the Washington State population of western gray squirrels as 'distinct' because it is geographically separated from other western gray squirrels? Or can the

---

[10] The partnerships say Treasury Regulation § 1.170A-14(d)(3)(ii) exceeds the statutory text by eliminating the word "relatively" from the description of natural habitat and replacing it with "significant." It turns out not to matter here, but this could be problematic under our duty to give effect to every clause and word of a statute while no longer deferring to an agency's interpretation of a perceived statutory ambiguity. *Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2273 (2024), *overruling Chevron U.S.A. Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984); *United States v. Menasche*, 348 U.S. 528, 538–39 (1955).

We don't need to reach this issue, though. We agree with and are bound by the Eleventh Circuit in interpreting Treasury Regulation § 1.170A-14(d)(3)(ii)'s use of "significant" as simply being synonymous with "non-trivial" and thus not construe it to mean more than the Code supports. *Champions Retreat Golf Founders, LLC v. Commissioner*, 959 F.3d 1033, 1036 (11th Cir. 2020), *vacating and remanding* T.C. Memo. 2018-146.

**[\*20]** Service take into account that the genetic makeup of the Washington population does not differ markedly from the rest?").

It's all relative. The regulation permits some of the property to be altered to some extent by human activity so long as wildlife continues to exist in the property in a relatively natural state. Treas. Reg. § 1.170A-14(d)(3)(i). And the presence of rare, endangered, or threatened species and their level of rarity is a fact-specific inquiry. *Compare Atkinson*, 110 T.C.M. (CCH) at 558 (rare doesn't necessarily mean globally imperiled), *with Butler v. Commissioner*, 103 T.C.M. (CCH) 1359, 1364 (2012) (one rare, endangered, or threatened species is enough).

The Eleventh Circuit has described how to cobble these provisions together to decide whether an easement was donated for the protection of a relatively natural habitat. In *Champions Retreat*, the donor placed a conservation easement on land that included a golf course. *Champions Retreat Golf Founders, LLC v. Commissioner*, 959 F.3d at 1034. Despite the presence of development and the land's not being readily accessible to the public, the taxpayer's experts still identified species of rare birds and plants as well as a regionally declining squirrel species on the property. *Id.* The Eleventh Circuit held that the Code requires only a relatively natural habitat or similar ecosystem—not that the land itself be relatively natural. *Id.* at 1037; *see also Glass*, 124 T.C. at 282 (easements protected environment that was habitat of a rare or endangered species).

We find no reason to depart from the Eleventh Circuit's flexible reading of "rare," "endangered," and "threatened" in the Code to distinguish between species that "reasonably warrant protection . . . from commonly occurring species for which the loss of habitat is not of significant concern." *Champions Retreat Golf Founders, LLC v. Commissioner*, 959 F.3d at 1036. We'll use this approach in determining whether the Kimberly Road and South Fulton easements preserved a relatively natural habitat of fish, wildlife, or plants, or of a similar ecosystem under section 170(h)(4)(A)(ii).

2. *Kimberly Road*

The Kimberly Road BDR identified the high-priority habitat of mature oak-hickory-pine forest on the property and concluded it was a relatively natural habitat. It noted a number of migratory bird species on the property but didn't identify any rare species. It also noted that

[*21] the forest provided habitat for more common species such as raccoons, armadillos, squirrels, and box turtles, and that the protection of a mature hardwood forest in a large metropolitan area like Atlanta provides important habitat for migratory birds.

The partnerships also hired Stephen Echols and Christopher Wilson to survey and draft assessments of the wildlife on the properties. Wilson is a former staff biologist at the North American Land Trust and now specializes in taking wildlife inventories. We recognized him as an expert in wildlife biology and conservation. Echols has worked for the North American Land Trust as an ecologist. We recognized him as an expert in botany, ecology, and conservation.

Echols and Wilson identified four rare and threatened species on the property. These are the downy arrowwood, which is a shrub that Georgia has identified as a critically imperiled species; the brown-headed nuthatch, a small songbird listed by the Atlantic Coast Joint Venture (ACJV) as a high-priority species; the Carolina chickadee, another small bird that the ACJV recognized as having moderate priority;[11] and the tricolored bat, which is threatened and has been proposed for listing under the Endangered Species Act. Echols also spotted the pink ladyslipper, an orchid that Georgia identifies as an "unusual species."

The Commissioner's expert, conservation consultant Dr. Reed Noss,[12] credibly said that he trusted Wilson's and Echols's identifications in their wildlife surveys. We do as well. These are all examples of rare, endangered, or threatened species, and their presence on the property speaks to its being a significant habitat. *See Champions Retreat Golf Founders, LLC v. Commissioner*, 959 F.3d at 1037.

But the Commissioner says that the Kimberly Road property isn't a high-quality example of relatively natural habitat because it is too small, the oak-hickory-pine forest takes up less than half the property, and the forest has been degraded.

We do not think that an oak-hickory-pine forest, a high-priority habitat as identified by the state of Georgia, located on more than 40% of this 25-acre property, is insufficiently large. The Code doesn't require a minimum size for a conservation easement. *Glass v. Commissioner*,

[11] Both birds were also present on the property discussed in *Champions Retreat Golf Founders, LLC v. Commissioner*, 959 F.3d at 1038.

[12] We recognized Dr. Noss as an expert in conservation, biology, and ecology.

[*22] 471 F.3d at 711. And the Code doesn't require that a species inhabit the entire property. If it did, that might cut against the property's being a relatively natural habitat. *See Champions Retreat Golf Founders, LLC v. Commissioner*, 959 F.3d at 1039 ("one might reasonably doubt that land consisting entirely of knotweed would provide a relatively natural habitat or would support the many bird species present on the land").

This is even more so the case for the Kimberly Road property, because it is in an urban county. We agree with the partnerships that the conservation purpose of section 170(h) is especially important in an urban area when the alternative is the continued decline and human impact on natural areas in areas surrounding the property. *See Champions Retreat Golf Founders, LLC v. Commissioner*, 959 F.3d at 1039.

The Commissioner does argue that the land-management plans weren't sufficient to maintain the properties' conservation values because they lacked a proper controlled burn plan and the accumulation of trash, car tires, and an old car chassis on the property reduced the ecological viability of the site.

While we don't dispute Dr. Noss's testimony that toxic chemicals from the tires could leach into and degrade the property, the fact remains that Dr. Noss observed oak-hickory-pine forest that covered much of the property without major human disturbance. And he admitted that a controlled burn plan might not even be legal in a large, populated city like Atlanta. We therefore find the Commissioner's argument here unavailing and also find that the Kimberly Road property has the conservation purpose of a relatively natural habitat under section 170(h)(4)(A)(ii).

3.      *South Fulton*

The South Fulton BDR also identified a regrown oak-hickory-pine forest, as well as streams and wetlands already spotted by the U.S. Fish and Wildlife Service National Wetland Inventory. It noted no manmade features other than some trails on the site.

Echols and Wilson assessed the wildlife on the South Fulton property. They found it a habitat for the tricolored bat. They also found four bird species that the ACJV numbers among its priorities, including the brown-headed nuthatch and the Carolina chickadee, as well as

[*23] nesting for the four-toed salamander—a lungless amphibian which the state identifies as vulnerable.

They spotted as well the bay starvine, a shrub that Georgia classifies as threatened. The Commissioner argues that the starvine should be considered only rare and not threatened or endangered.[13] He also says that South Fulton doesn't adequately serve as a habitat for it because it is too narrow and thus susceptible to invasive species and "edge effects."

We've held that the lack of a proper "edge" in a donated conservation easement property can cause us to find that a property doesn't provide a significant natural habitat for plants and wildlife. *Atkinson*, 110 T.C.M. (CCH) at 561. But the easement placed on the subject property in *Atkinson* was located on a residential development, not vacant land as is the case here. *Id.* at 551. And the presence and abundance of the aforementioned species on the 100-plus acres of the vacant South Fulton property lead us to find that any potential edge effects don't significantly affect the ability of the easement on the South Fulton property to protect a relatively significant natural habitat.

The Commissioner also argues that South Fulton's BDR is insufficient. The South Fulton BDR is laconic compared to the Kimberly Road BDR, which included a more detailed description of species inhabiting the property. We find no reason to doubt Dr. Noss's statement that it was the worst BDR he had ever seen. But it did include, as the regulation suggests, a boundary survey, a map, photos of the property, its title and development histories, vantage points in which to view the property, descriptions of the hardwood forest, and a certification of accuracy.

We find that these inclusions meet Treasury Regulation § 1.170A-14(g)(5)(i)'s documentation requirement. We therefore find that the South Fulton property also meets the conservation purpose of a relatively natural habitat under section 170(h)(4)(A)(ii).

### 4. *Increased Viability of Adjoining Habitat*

Another way in which a property can satisfy the regulation's "significant" requirement is by increasing or contributing to the

---

[13] Why this distinction is relevant is beyond us. The regulation states that the habitat or ecosystem can be but isn't limited to a home for rare, threatened, or endangered species. Treas. Reg. § 1.170A-14(d)(3)(ii).

[*24] ecological viability of a state, local, or national park, a wildlife refuge, or a similar conservation area. Treas. Reg. § 1.170A-14(d)(3)(ii). The partnerships argue that the Kimberly Road property satisfies this requirement because it contributes to an adjoining conservation easement.

Just north of the Kimberly Road property sits another conservation easement owned by Kim Road, LLC. Kim Road, LLC, granted a conservation easement on 48 acres of land to the Atlantic Coast Conservatory in 2013. It shares the same oak-hickory-pine forest as the Kimberly Road property. Echols testified that the northern edge of the Kimberly Road conservation easement contributes to Kim Road, LLC's larger and adjoining conservation easement's viability.

The Commissioner nevertheless says the combined size of these two properties is too small to meet this regulatory requirement. We disagree. Again, the conservation purpose of section 170(h) can be enhanced when the property in question is in an urban area and would otherwise be at risk of continued human impact and development. *See Champions Retreat Golf Founders, LLC v. Commissioner*, 959 F.3d at 1039; *Mill Rd.*, T.C. Memo. 2023-129, at *19 ("But in a suburban setting, an easement covering 33 acres is hardly negligible").

D.    *Open Space Protection*

1.    *General Principles*

The other conservation purpose at issue here is whether the subject properties preserve open space that will yield a significant public benefit. *See* I.R.C. § 170(h)(4)(A); Treas. Reg. § 1.170A-14(d)(4). This purpose is accomplished if open space allows for the scenic enjoyment of the general public or is pursuant to a clearly delineated federal, state, or local governmental conservation policy. Treas. Reg. § 1.170A-14(d)(4).

A good example of protecting open space is preserving the land in its "natural state." *See Turner v. Commissioner*, 126 T.C. 299, 313 (2006). But that may not mean much if the property is not held for the scenic enjoyment of the general public or pursuant to a government policy. *See Atkinson*, 110 T.C.M. (CCH) at 562 (easement areas confined in gated golf community not visible from public highways or waterways).

The Eleventh Circuit reminds us that scenic enjoyment is relative and context specific. Recall that in *Champions Retreat* the subject

**[\*25]** property included a private golf course and wasn't readily observable or accessible to the public. In that case, the court observed that members of the public could boat and view the easement from a river that ran alongside it, and that—when compared to dense residential development such as condos—the easement property qualified as open space that provided scenic enjoyment. *Champions Retreat Golf Founders, LLC v. Commissioner*, 959 F.3d at 1034, 1040.

### 2. *Scenic Value*

Do the properties here have scenic value? We consider the eight factors that the regulation lists:

- the compatibility of the land use with other land in the vicinity;

- the degree of contrast and variety provided by the visual scene;

- the openness of the land (which would be a more significant factor in an urban or densely populated setting or in a heavily wooded area);

- relief from urban closeness;

- the harmonious variety of shapes and textures;

- the degree to which the land use maintains the scale and character of the urban landscape to preserve open space, visual enjoyment, and sunlight for the surrounding area;

- the consistency of the proposed scenic view with a methodical state scenic-identification program, such as a state landscape inventory; and

- the consistency of the proposed scenic view with a regional or local landscape inventory made pursuant to a sufficiently rigorous review process, especially if the donation is endorsed by an appropriate state or local governmental agency.

Treas. Reg. § 1.170A-14(d)(4)(ii)(A).

Travelers can see the Kimberly Road property and its forest along 700 feet of Kimberly Road. Travelers can see the forested South Fulton property while traveling at least 1,000 feet along three different roads. And both the Kimberly Road and South Fulton deeds had specific

**[*26]** provisions to protect these views from those roads. *See Turner*, 126 T.C. at 314.

We find that the easements contributed to scenic enjoyment of their respective areas by providing a degree of contrast and variety to these developing parts of the Atlanta area and providing relief from urban closeness.

### 3. *Pursuant to a Government Policy*

Which government do we look to for this requirement? The Code says a state, a local, or the federal government. I.R.C. § 170(h)(4)(A)(iii)(II). And how clearly delineated must this policy be? At least some specificity in identifying a government policy under section 170(h)(4)(A) is required. *See Atkinson*, 110 T.C.M. (CCH) at 562 (mentioning state law does not establish clearly delineated policy).

The partnerships point to the Georgia State Wildlife Action Plan (SWAP), a plan overseen by the Georgia Department of Natural Resources, in arguing that the easements were granted pursuant to a government policy. The Georgia SWAP is specifically mentioned in the deeds of conservation easement, and it identifies the oak-hickory-pine forests that are found on both subject properties as high-priority habitats in the state. *See also Butler*, 103 T.C.M. (CCH) at 1364 (noting that oak-hickory-pine forest has recently been affected by urban sprawl in the southeastern United States). And the BDRs, SCT monitoring reports, and land-management plans for the properties identify the Georgia SWAP's classification of the forests as a relevant government policy.

The Commissioner says that the Georgia SWAP doesn't specifically mention the subject properties and that the easements therefore weren't granted pursuant to a government policy. He cites the finding in *Champions Retreat Golf Founders, LLC v. Commissioner*, 959 F.3d at 1036, that a county designating land as greenspace was an insufficiently specific and delineated governmental policy.

We decline to read section 170(h)(4)(A)(iii)(II) so narrowly as to require a government policy to mention specific tracts of land to meet this criterion. The exact type of forest protected by the Georgia SWAP was located throughout the subject properties. We find that the easements were granted pursuant to the Georgia SWAP, which is a clearly delineated governmental policy.

[*27]       4.    *Significant Public Benefit*

Even if we find that the easement contributions were made for scenic enjoyment or pursuant to a government policy, we must also find that they yielded a significant public benefit.  I.R.C. § 170(h)(4)(A)(iii).  The regulation lists 11 factors to consider.  Of those, the partnerships say that the properties satisfy four:

- the uniqueness of the property to the area;

- the intensity of land development in the vicinity of the property (both existing and foreseeable trends in development);

- the consistency of the proposed open-space use with public programs for conservation in the region; and

- the likelihood that development of the property would lead to or contribute to the degradation of the scenic, natural, or historical character of the area.

Treas. Reg. § 1.170A-14(d)(4)(iv)(A).

The partnerships also argue that the Kimberly Road property satisfies another factor: the consistency of the proposed open-space use with existing private conservation programs in the area—because it adjoins the Kim Road, LLC, conservation easement granted to the Atlantic Coast Conservancy.  Just as we found that the Kimberly Road property increased the viability of the adjoining Kim Road, LLC, habitat under Treasury Regulation § 1.170A-14(d)(3)(ii), so also we find that Kimberly Road meets this factor.

We find that both properties will yield a significant public benefit.  Both properties' forested habitats can be viewed along significant portions of major thoroughfares in the Atlanta region.  *See id.* subpara. (4)(ii)(B) (entire property need not be visible to public, but inadequate if only small portion is).  They are also consistent with the Georgia SWAP's government policy to preserve oak-hickory-pine forests of the type found on both the Kimberly Road and South Fulton properties.  *See Townley v. United States*, 729 F. Supp. 3d 1320, 1328 (M.D. Ga. 2024).

E.    *The Reserved Rights Problem*

Section 170(h)(1) requires a contributed easement be exclusively for conservation purposes.  This requires proof of both conservation

**[\*28]** purpose and perpetuity. *See Valley Park Ranch, LLC v. Commissioner*, 162 T.C. 110, 131 (2024).

The Commissioner contends that the sheer number of reserved rights in the Kimberly Road and South Fulton easements undermines any conservation purpose because they might allow such extensive development. These reserved rights include logging on both properties and agricultural, forestry, and hunting and horseback riding on the South Fulton property.

We've held that a conservation easement did not protect a relatively natural habitat of longleaf pine trees if the easement allowed for the removal of a large number of trees on the property. *Atkinson*, 110 T.C.M. (CCH) at 556. But in that case it wasn't clear from the record how much of the property was actually covered by the protected tree species. *Id.* The subject property there was a residential development with a golf course, in contrast to the mostly vacant land of South Fulton. *Id.* at 551, 557. We also found the purported conservation easement lacked a management plan—including prescribed burning or cutting— to ensure that the protected tree species would reach and maintain a relatively natural state. *Id.* at 557.

These defects aren't present here. These easements restrict use by limiting development on the properties. The deeds do not provide for reversionary interests in the properties to the partnerships. And their management plans prohibit the use of all-terrain vehicles on the properties to limit the environmental effects of the reserved rights to use the properties for recreation.

We find credible Quattlebaum's testimony that, in her experience, allowing hunting on conserved lands is a useful monitoring mechanism against dumping and other trespassers. She helped draft the easement deeds and recommended to Carbonara that he find someone to hunt on the property. We also find credible SCT's monitoring efforts and management, which also distinguish these cases from *Atkinson*.

We decline to find that the easements' reserved rights undermine their conservation purposes.

F. *Entire Interest*

A donated easement must perpetually protect its conservation purposes, and the Commissioner notes that there are energy-pipeline and utility easements on the Kimberly Road property that, because of

**[\*29]** their priority, prevent SCT from enforcing its rights and thus that the property isn't perpetually protected as required by section 170(h)(5)(A).

It turns out these easements were granted during World War II. There's no evidence in the record to show that, during the 80-plus years since these easements were granted, a pipeline was actually placed on the property. We agree with the partnerships that the likelihood that this right would be exercised is so remote as to be negligible. *See* Treas. Reg. § 1.170A-14(g)(3). We therefore find that these utility easements don't violate the protected-in-perpetuity requirement of section 170(h)(5)(A). *See Valley Park Ranch*, 162 T.C. at 131.

G.    *Conclusion*

We conclude that the easements have the conservation purpose of preserving a relatively natural habitat of fish, wildlife, or plants, or of a similar ecosystem as well as the preservation of open space that yields a significant public benefit. This makes them qualified conservation contributions under section 170(h).

V.    *Valuation*

A.    *Background*

1.    *The General Rule*

The fair-market value of a conservation easement is measured at the time it was contributed. Treas. Reg. § 1.170A-14(h)(3)(i). The regulation defines that value as the price at which the property would be exchanged between a willing buyer and a willing seller. Treas. Reg. § 1.170A-1(c)(2). And the regulations want us to determine that value, if possible, by comparing the donated easement to sales of comparable easements. Treas. Reg. § 1.170A-14(h)(3)(i).

This never seems to work because conservation easements generally don't trade on the open market. *See Symington v. Commissioner*, 87 T.C. 892, 895 (1986). The Kimberly Road and South Fulton easement deeds also limit their transferability.

If there's no substantial record of comparable easement sales—as the parties stipulate that there isn't here—then we look to sales of comparable properties, taking into account the properties' highest and best uses (HBUs) before and after creation of the easements. *See* Treas.

**[\*30]** Reg. § 1.170A-14(h)(3)(ii); *Hilborn v. Commissioner*, 85 T.C. 677, 689–90 (1985). But we are not to mechanically apply this method if there are other reliable market indicators available. Treas. Reg. § 1.170A-14(h)(3)(i); *Dorsey v. Commissioner*, 59 T.C.M. (CCH) 592, 599 (1990).

### 2. *Comparable Sales Approach*

The parties agree that the best way to estimate the before values of these properties is to find comparable sales. *See Hilborn*, 85 T.C. at 689. They both professed to find sales of properties similar to the subject properties in arm's-length transactions that occurred within a reasonable time of the appraisal dates. *See Wolfsen Land & Cattle Co. v. Commissioner*, 72 T.C. 1, 19 (1979).

The parties hired experts in real-estate appraisal to testify about this method and apply it in these cases. We admit an expert opinion if we find it helpful to understand a factual issue and weigh it in the light of the demonstrated qualifications of the offered expert and all other credible evidence. Fed. R. Evid. 702; *Johnson v. Commissioner*, 85 T.C. 469, 477 (1985).

### 3. *The Parties' Experts*

Kimberly Road and South Fulton retained Spears to prepare appraisals of the subject properties. He is certified as an appraiser in Florida and Georgia and started Global Valuation to conduct appraisals of international properties for clients, including entire islands in the Caribbean Sea. These appraisals were some of his first conservation easements, although he testified that he took courses to become competent in this subset of the appraisal profession. We recognized him as an expert in the appraisal of real estate.

Spears focused his appraisals on the subject properties' zoning and HBU. He then found vacant land with similar zoning in the Atlanta metro region that was sold and later actually developed for such a use. This, he testified, justified his use of the properties that housed large tenants such as Top Golf and LA Fitness. In focusing his appraisal this way, Spears included in his before-and-after approach sales from Fulton County as well as more suburban and rural Georgia counties and municipalities such as Cobb, Kennesaw, Johns Creek, and Roswell.

Spears appraised both properties. He appraised the Kimberly Road property in 2017 before the granting of the easement at

[*31] $10,442,000, and its "after" value at $85,941. He appraised South Fulton's "before" value at $23,681,000 and appraised its "after" value at $466,000. Spears was not concerned with the subject properties' topography—as an appraiser in Georgia since the 1980s, he's used to appraising land with rolling terrain.

South Fulton bolstered its valuation by retaining another expert to testify specifically about that property's physical limits because it included so much uneven ground. That expert, Mary Michael, focused on the "physically possible" component of that subject property's HBU.[14] She is the principal at her own architecture firm which advises on real-estate projects in the Atlanta area, and is a registered landscape architect in Georgia. We recognized Michael as an expert in urban land planning. Her reports looked at the zoning, topography, and building types included in Union City's zoning ordinance as applied to the South Fulton property, and she designed concept plans for what she thought could be the most valuable and densest developments that would fit on it. She determined that it was physically possible—from an engineering perspective—to fit a six-story residential building on South Fulton by using a subsurface parking garage to counteract the effects of its steep grade. She did not, however, provide any estimate of the cost of such a feat.

The Commissioner countered with the report and testimony of Raymond Krasinski. He reviewed Spears's reports—specifically whether they complied with The Appraisal Foundation's standards, whose acronym our court has become increasingly familiar with in resolving these conservation easement cases: USPAP.[15] He has taught appraisal for 25 years. We recognized him as an expert in real-property appraisal, appraisal review, and USPAP.

Krasinski concluded that Spears's Kimberly Road report wasn't reliable. He concluded that many of Spears's comparable sales weren't comparable, including one that was listed rather than sold and another that was a valuable parcel just off an interstate interchange. He found

---

[14] Spears incorporated Michael's architectural assumptions into his appraisal, although he had never met Michael when he drafted his appraisal and didn't seem at trial to know what exactly her profession was.

[15] This stands for the Uniform Standards of Professional Appraisal Practice. It's a widely accepted and recognized standard in the appraisal profession, adherence to which we may take as evidence that an appraiser's valuation report is reliable. *See Buckelew Farm, LLC v. Commissioner*, T.C. Memo. 2024-52, at *48–49, *aff'd*, No. 24-13268, 2025 WL 2502669 (11th Cir. Sep. 2, 2025).

[*32] similar issues with the comparables that Spears selected for South Fulton, although he conceded that its Town Center Mixed Use Zoning is generally considered a lucrative zoning designation.

The Commissioner also submitted his own appraisals of the subject properties. He hired Charles Brigden, who has 20 years of experience as an appraiser and is currently employed by the international real-estate services behemoth Jones Lang LaSalle. Brigden has appraised or reviewed close to 500 conservation easements for both the government and taxpayers. We recognized him as an expert in real-estate valuation, qualified conservation-easement contribution valuations, and USPAP.

Brigden's appraisals used the "before and after" approach for valuing the properties and drew on comparable sales of vacant land. Brigden presented these comparables visually in a market analysis that the partnerships have termed "Brigden Boxes" in which he drew rectangles on a map surrounding the subject properties' market areas, plotted in those boxes sales of vacant land that had occurred around the time of the transactions, and removed from his analyses those he concluded to be in significantly different market areas, such as those next to interstate interchanges.

Brigden concluded that the "before" fair-market value of the Kimberly Road property was $470,000 in 2017 without the easement, and that the "after" value with the easement was $40,000. Brigden appraised the "before" value of the South Fulton property at $700,000 in 2017, and the "after" value encumbered with the easement at $90,000. Brigden made adjustments to his valuations based on what he described as the challenging topography of the subject properties in contrast to some of the comparables in his market analyses.

Kimberly Road and South Fulton on rebuttal introduced an appraiser to review Brigden's appraisals. Douglas Kenny grew up in Fulton County and holds the prestigious MAI designation from the Appraisal Institute. We recognized him as an expert in appraisal, real-estate appraisal, and appraisal review. Kenny thought that Brigden's market analyses undervalued the subject properties' higher density zoning and overstated the topographical challenges which Brigden claimed hindered high-density development.

**[\*33]** B.    *The Inventory Rule*

There's an exception that the Commissioner says is in play. Because Grant was a "land man" and helped contribute the subject properties to the partnerships, the Commissioner urges us to find that the subject properties were inventory.

Such a finding could limit the amount of the charitable deductions allocated to the partners. Section 170(e)(1)(A) reduces the amount of that deduction by the amount of gain that wouldn't have been long-term capital gain on the property contributed had it been sold at fair-market value. Sections 724(d)(2) and 751(d) also apply to inventory property. The Commissioner cites an Eleventh Circuit case that he says should guide our inquiry into whether the subject properties were held by the partnerships in the ordinary course of business. *See Sanders v. United States*, 740 F.2d 886, 888–89 (11th Cir. 1984).

But there will be no *Sanders* analysis here. The Commissioner mentions this inventory rule or inventory accounting only in his answering brief. Because of this, the partnerships don't mention it in either of their briefs. It's within our discretion to permit a new issue or ground if we find that the opposing party isn't prejudiced by such permission. *Leahy v. Commissioner*, 87 T.C. 56, 64 (1986). Raising this argument in the Commissioner's answering brief, however, means that the partnerships never had a chance to mount an opposition at trial. We thus find it to be a new issue and preclude its consideration. *See Smalley*, 116 T.C. at 457 n.4.

    C.    *The Before and After Values of the Properties*

        1.    *Before*

            a.    *Legal Background*

That finally lands us on the big-money issue in these cases—what are the properties' before-and-after values? We first consider HBU before the easements were granted to determine their "before" values. Treas. Reg. § 1.170A-14(h)(3)(ii). Appraisers look to four things: legal permissibility, physical possibility, economic viability, and maximal productivity. *Whitehouse Hotel Ltd. P'ship v. Commissioner*, 139 T.C. 304, 331 (2012), *aff'd in part, remanded on other grounds*, 755 F.3d 236 (5th Cir. 2014); Appraisal Institute, *The Appraisal of Real Estate* 307 (15th ed. 2020).

**[*34]** The parties differ wildly on the before values of the properties. And many of their differences stem from their disagreement about the HBUs of the properties before the easements.

b. *Petitioners' Arguments*

Spears identified the HBU of the Kimberly Road property as an ALF and the HBU of the South Fulton property as a mix of high-density residential and commercial uses. He led off both of his appraisals by stating these assumptions and extrapolating the various rental rates from such uses into his market study to identify comparable sales.

Spears found an ALF legally permissible because Kimberly Road was zoned RG-3. He noted that a certificate of need is legally required in Georgia before such a facility can be built, though, and a certificate of occupancy before it begins housing residents. Kimberly Road had applied for neither. He nevertheless found it reasonable that such certificates would be granted due to the property's zoning.

Spears found a 600-unit ALF physically possible because the Falcon Design concept plan showed that such a unit could fit on the property. He found it financially feasible based on his market extrapolation of the ALF rents around Atlanta. He thought an ALF would be maximally productive due to other market analyses showing that the retirement-community industry is expected to see exceptional growth during the next two decades.

He applied a similar analysis to South Fulton. He found that a mixed-use development was legally permissible in Union City due to the property's Town Center Mixed Use zoning, that its large size made such a development physically possible, that it would be financially feasible after he compared the sale price per acre to other mixed-use developments that had sold in the Atlanta region, and that it would be maximally productive due to the strong demand for mixed-use developments around the region.

Sales of properties that were developed into ALFs surrounding the Kimberly Road property were lacking. Spears therefore drew on a 21-county area to find sales of comparable properties for the Kimberly Road property. He did the same for the South Fulton property.

This large market area led to Spears's identifying comparable sales both near the subject properties and dozens of miles away in wealthy enclaves of Atlanta and its suburbs. One of these comparables

**[*35]** was a strip mall with an LA Fitness. Another had a Whole Foods. After identifying comparable sales in this manner and adjusting for the properties' size and other factors like topography, Spears averaged their prices per acre—which ranged from the low $200,000s up to $700,000 per acre. He then extrapolated near the mean of these ranges to come up with his before values of the subject properties.

c.   *The Commissioner's Arguments*

The Commissioner says Spears's appraisals are flawed. He argues that Spears presumed particular HBUs for the properties before conducting his market analyses and appraisals to see what the market would support. He also argues that Spears's multicounty market analyses were much too large to accurately value these vacant properties in a specific corner of the Atlanta area. Spears should have, the Commissioner says, looked to land sales of comparable size, zoning, and topography located near the subject properties.

The Commissioner's experts agree. Brigden testified that Spears's comparables were too far away from the subject properties' markets and were often superior parcels in part because of their locations. Brigden also took issue with Spears's including in comparable sales a property that was merely listed and hadn't sold, as well as multiple sales including a large conservation-easement promoter in Atlanta whose motivations he says don't necessarily reflect those of the broader real estate market for vacant land. He noted that a property neighboring the South Fulton property sold for only $100,000 an acre— a fourth of the value that Spears assigned in his appraisal.

Krasinski testified that Spears used accepted appraising methodologies but failed to perform them properly. He found Spears's comparables for the Kimberly Road property unsupportable because, unlike the subject property, they already had the requisite land-use entitlements, demand, and higher population density to actually support ALFs. He called the southwest quadrant of the Atlanta market, where the subject properties are located, the "wicked stepchild" of the market and stated that property values there are lagging as compared to the rest of the "booming" Atlanta market.

Brigden's appraisal reports took these factors into account when appraising the properties. For the Kimberly Road property, he selected four comparables that were located within 17 miles of the subject property and of similar size and topography. He made adjustments for

**[*36]** nine areas where at least one of the comparables differed, including location, size, water amenities, zoning, and access to roads. He concluded that the Kimberly Road property's HBU before the easement was granted was vacant land/future low density residential or recreational use, and that it was worth $470,000.

He did the same type of market analysis and made the same adjustments for the South Fulton property. Despite its larger size, Brigden found comparable sales within nine miles of the South Fulton property. He made a downward adjustment due to the property not having access to the South Fulton Parkway. He concluded its highest and best use was low-density single-unit residential/hold for future development, and that it was worth $700,000 when the easement was donated.

d.   *Analysis*

A property's HBU is the highest and most profitable use for which it's adaptable and needed or likely to be needed in the reasonably near future. *Olson v. United States*, 292 U.S. 246, 255 (1934). If different from the current use of a property, though, we typically require a proposed HBU to be close in time to the current use and reasonably probable. *Hilborn*, 85 T.C. at 689.

The classification of the use—whether it be commercial, residential, or vacant, recreational land—is significant and relates directly to the value of the properties. *Estate of Lloyd v. Commissioner*, 71 T.C.M. (CCH) 1903, 1910 (1996). The mere fact that current zoning restrictions do or don't permit a particular use doesn't necessarily preclude a consideration of an unpermitted use when considering a property's HBU, but there must be a reasonable possibility that such legal hurdles will change shortly thereafter the granting of the easement. *Id.* at 1911. We may consider how zoning and related land-use laws may restrict the property's development before the placing of the easement, but not necessarily how the owner of the property says he intends to use the property. *Dorsey*, 59 T.C.M. (CCH) at 599.

The fair-market value of a property ultimately turns on its realistic and objective potential use. *Stanley Works & Subs. v. Commissioner*, 87 T.C. 389, 400 (1986). And we often rely on experts to give us their opinions about these uses and valuations. We find appraisers credible who, after identifying a property's HBU, find "comparables with a similar highest and best use at the same stage of

[*37] development (*e.g. raw land*)" (emphasis added) or make reasonable adjustments if the comparables aren't at the same stage of development as the subject property. *Cave Buttes, LLC v. Commissioner*, 147 T.C. 338, 365 (2016). This is the comparable-sales method, and we have found it is "usually the most reliable indicator of value when sufficient information exists about sales of properties resembling the subject property." *N. Donald LA Prop., LLC v. Commissioner*, T.C. Memo. 2026-19, at *50; *see also Excelsior Aggregates, LLC v. Commissioner*, T.C. Memo. 2024-60, at *33. It determines the fair-market value of a property by considering the sale prices realized for similar properties in arm's-length transactions near in time to the valuation date. *Ranch Springs, LLC v. Commissioner*, 164 T.C. 93, 135 (2025). The most persuasive comparable sales are those dealing with property whose location, size, topography, use, and physical characteristics precisely resemble those of the subject property. *See Excelsior Aggregates*, T.C. Memo. 2024-60, at *49.

This is not at all what Spears did. We agree with the Commissioner that Spears's comparables for both properties weren't sufficiently similar to Kimberly Road or South Fulton. The key problem lay in Spears's method: He looked for sales of raw land that were then developed into what he identified as the HBU for each of the subject properties. But this meant that he excluded a great many sales comparable to those properties and much closer to them. That's not what a land buyer interested in building an ALF or a large, mixed-use development would do. Such a hypothetical buyer wouldn't look to pay what a competitor paid 50 or more miles away in a heavily developed area. He would look to pay the least amount of money for raw land that was physically capable and legally permissible to develop near where he wanted to build. The comparable sales that he drew were all over the metropolitan Atlanta area and were primarily sales of developed properties. We find that these constituted a different market and were thus not comparable. *See Butler*, 103 T.C.M. (CCH) at 1389.

Spears also included some syndicated conservation easement sales, as well as an offer rather than a sale, in his analysis. We find these to have limited probative weight in estimating the value of a property. *Sharp v. United States*, 191 U.S. 341, 348 (1903). A reasonable buyer or seller would take into account physical access to the South Fulton property and the costs in grading, obtaining government approvals, and developing the properties to the high-density HBUs that Spears identified. *See Cave Buttes*, 147 T.C. at 365. And even though building these high-density developments was likely physically possible

[*38] on the properties, Spears should have adjusted his valuations to account for the higher costs of grading both of the properties and delivering materials to the South Fulton site. *See id.* at 367.

Spears's most fundamental problem, however, was that the starting point in his appraisals—that ALFs and mixed-use developments were the HBUs of the properties regardless of the properties' locations and market conditions or the financial feasibility of such developments—wasn't based on reliable market data or specific attributes of the properties apart from their zoning. *See Kaufman*, 107 T.C.M. (CCH) at 1273; *see also Dunlap v. Commissioner*, 103 T.C.M. (CCH) 1689, 1700 (2012) (finding appraisal report doesn't properly state a property's HBU when appraiser vacillated between both vacant and developed uses).

There isn't evidence in the record that the partnerships actually reached out to state and local licensing and zoning agencies to build ALFs or mixed-use developments on the subject properties. *See Dorsey*, 59 T.C.M. (CCH) at 600 (reviewing testimony of a zoning commissioner and a director of a permitting office and finding that the city would have approved the use proposed by the taxpayers, thus finding it legally possible).

Brigden's appraisals were much more reasonable. The comparables that he used for Kimberly Road were raw land, zoned similarly if not identically, and needed only minor adjustments for topography, location, and size. His analysis is entirely reasonable, and so we adopt his before value of Kimberly Road of $470,000 as our finding on this issue. He likewise used four comparable properties to value the South Fulton property. These were all vacant land and all had more favorable topography. But we found his report credible on the adjustments that he made to the comparables for topography, zoning, lot size, etc. This leads us to adopt his before value of South Fulton of $700,000 as our finding on this issue, and we adopt these two valuations as our findings of the properties' before values.

2.    *After*

Brigden identified the after value of the Kimberly Road property as $40,000. He identified the after value of the South Fulton property as $90,000. He based these conclusions on numerous sales of land encumbered with conservation easements. He used those properties that had reserved rights for one residence. We find this reasonable for

**[\*39]** both properties because the donations each excluded a small, one-acre slice of the property and these slices were thus not subject to any restrictions on development. He also carefully noted that the sale of hunting rights (one of the few uses reserved under the easement's terms) to the South Fulton property supported this valuation.

### 3. *Conclusion*

Subtracting the after values from the before values means that the partnerships are entitled to charitable deductions for conservation easements of $430,000 for Kimberly Road and $610,000 for South Fulton.

## VI. *Penalties*

The FPAAs determined the applicability of section 6662(h) gross-valuation misstatement penalties. This penalty applies if the value of property claimed on a return is 200% or more of the amount determined to be the correct value. It's a 40% penalty, and there's no reasonable-cause defense. I.R.C. § 6664(c)(3). This is a math question, and it is a math question that we must find the Commissioner got right. The parties stipulated that the Commissioner complied with the supervisory-approval requirement of section 6751(b)(1) in asserting these penalties, and we therefore uphold them.[16]

## VII. *Conclusion*

Because these are TEFRA cases,

*An appropriate order will be issued.*

---

[16] The FPAA also asserted a reportable-transaction penalty under section 6662A, but—as we've already stated—*Green Valley* precludes us from upholding it. We also need not determine whether the Commissioner was right to determine an accuracy-related penalty under section 6662(a).